**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Paul Frederick LANEY, Defendant–
Appellant.**

No. 98–10032.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1999.

Decided Aug. 30, 1999.

H. David Grunbaum, Assistant Federal Public Defender, San Jose, CA, for defendant-appellant.

D. Anthony West, Assistant United States Attorney, San Jose, CA, for plaintiff-appellee.

Before: KRAVITCH,* REINHARDT, and T.G. NELSON, Circuit Judges.

Opinion by Judge KRAVITCH; Concurrence by Judge T.G. NELSON; Partial Concurrence and Partial Dissent by Judge REINHARDT.

KRAVITCH, Circuit Judge:

Defendant-appellant Paul Frederick Laney pled guilty to three counts of conspiring to engage in and engaging in activities relating to the sexual exploitation of children. The district court sentenced him to 81 months in prison and ordered him to pay restitution to one of the conspiracy's victims. Laney's appeal of the sentence and the restitution order raises several issues concerning the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") and the restitution statutes.

I.

In late 1995, Laney and several other men began meeting regularly in an Internet chat room called KidsSexPics to discuss and trade child pornography.[1] Laney also had direct conversations by e-mail with one of KidsSexPics' members, Ronald Riva. In early 1996 Riva and a few of the other KidsSexPics participants created a private, invitation-only chat room called the "Orchid Club." The Orchid Club eventually grew to include sixteen members. Laney, the last to join, joined the club in February 1996. Orchid Club participants told each other stories about their sexual contact with minors and sent each other, via the Internet, digital files containing pornographic photographs and videos of children. Laney claims that he thought that the men were exchanging fantasies and publicly available pornography, rather than true stories and "homemade" images. Laney did, however, make a sexually explicit videotape of himself with two female children of his neighbors who were ages ten and eight ("Jane Does Two and Three"), and sent images from the tape to Riva. Laney claims that he refused to send the photos to any other Orchid Club member and asked Riva not to share them. Riva nevertheless forwarded the images to other members of the Orchid Club.

For several years Riva regularly had been molesting Jane Doe One, a friend of his young daughter's. In January 1996, Riva told other members of the Orchid Club that Jane Doe One, then age ten, was willing to be photographed performing sexual acts. Some of the members requested that Jane Doe One perform "live" over the Internet. Laney was not a party to these conversations. On March 16, 1996, Riva asked Laney for advice on how to teach a ten-year-old girl how to insert a vibrator. Laney sent Riva suggestions on how best to perform this act.

An "on-line molestation" of Jane Doe One occurred on April 1, 1996. Riva and another Orchid Club member, Melton Lee Myers, videotaped Jane Doe One engaging in various sexual acts, including having a vibrator inserted into her vagina. They immediately transmitted the images over the Internet to other members, who replied with requests for further sexual acts. Laney did not participate in the on-line

---

* The Honorable Phyllis A. Kravitch, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. A "chat room" is a public or private Internet site that allows people to send messages to one another in "real time."

molestation or know about it beforehand. Riva sent him copies of the images of Jane Doe One on April 6, 1996, and he and Laney discussed them.

After one of Riva's victims complained, the police arrested Riva and Myers. A search of Riva's computer files led to Laney's arrest in June 1996. Laney immediately agreed to cooperate with the government's investigation; his cooperation helped the government identify at least four other participants in the conspiracy. A grand jury returned a 24–count indictment, and a substantially similar superseding indictment, against Laney and fifteen co-defendants, charging various violations relating to the sexual exploitation of children. The indictment listed three charges against Laney: Count One (conspiracy to sexually exploit children in violation of 18 U.S.C. §§ 2251(a), (d)); Count Two (conspiracy to engage in certain activities relating to the sexual exploitation of children in violation of 18 U.S.C. §§ 2252(a), (b)(1)); and Count Eighteen (distribution of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(1)). Laney pled guilty to all three counts without reaching an agreement with the government on sentencing.

In a judgment dated December 22, 1997, the district court sentenced Laney to 81 months' incarceration. Three aspects of the sentence are relevant to this appeal. First, the court increased Laney's base offense level for Counts Two and Eighteen by five levels for "distribution" pursuant to section 2G2.2(b)(2) of the Guidelines.[2] Second, the court included the on-line molestation of Jane Doe One as "relevant conduct" to Count One under U.S.S.G. § 1B1.3(a), which increased Laney's Com-

bined Offense Level by one level under U.S.S.G. § 2G2.1(c) and Chapter 3, Part D. Third, the court awarded Laney a downward departure of five levels for substantial assistance to the government pursuant to U.S.S.G. § 5K1.1. The government had requested a five-level departure at sentencing, while Laney requested a ten-level departure. The district court denied Laney's request for an evidentiary hearing on the extent of departure. In addition, pursuant to 18 U.S.C. § 2259, the district court ordered Laney and five other Orchid Club members jointly and severally to pay $60,000 restitution to Jane Doe One. This amount included the cost of psychological treatment that Jane Doe One and her family expected to need in the future as a result of the defendants' crimes.

Laney appeals his sentence and the restitution order. Finding no error, we affirm.

## II.

### A.

The district court increased Laney's base offense level by five levels for "distribution" of child pornography pursuant to U.S.S.G. § 2G2.2(b)(2).[3] Laney argues that "distribution," for purposes of section 2G2.2(b)(2), means distribution for pecuniary gain. Because he sent pornographic images only to Riva and had no intention of receiving any financial compensation for the images, he contends, the district court erred by imposing the five-level increase.

We review a district court's interpretation and application of the Guidelines *de novo*. *See United States v. Bai-*

---

**2.** All references are to the November 1, 1995, version of the Guidelines, the version the district court used in sentencing Laney.

**3.** Section 2G2.2(a) sets a base offense level of 15 for trafficking, possessing with intent to traffic, receiving, transporting, shipping, or advertising material involving the sexual exploitation of a minor. Section 2G2.2(b)(2) states, "[i]f the offense involved distribution, increase by the number of levels from the

table in § 2F1.1 corresponding to the retail value of the material, but in no event by less than 5 levels." The table in section 2F1.1 correlates offense level increases to dollar amounts; a five-level increase applies to a value between $40,000 and $70,000. Application Note 1 to Section 2G2.2 states that "distribution" "includes any act related to distribution for pecuniary gain, including production, transportation, and possession with intent to distribute."

*ley,* 139 F.3d 667, 667 (9th Cir.1998). This circuit has not addressed the question of whether a defendant who delivers child pornography for non-pecuniary reasons engages in "distribution" for purposes of section 2G2.2(b)(2). The circuits that have considered this issue are in conflict. In *United States v. Black,* 116 F.3d 198, 202–03 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 341, 139 L.Ed.2d 264 (1997), the Seventh Circuit held that section 2G2.2(b)(2) only applies to transactions entered into for pecuniary gain. The court noted, however, that the definition of "pecuniary gain" included "the possibility of swaps, barter, in-kind transactions, or other valuable consideration." *Id.* at 203.[4] Four circuits, on the other hand, have refused to confine section 2G2.2(b)(2)'s applicability solely to acts committed for monetary gain. *See United States v. Horn,* 187 F.3d 781, 791 (8th Cir.1999); *United States v. Lorge,* 166 F.3d 516, 518–19 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 1372, 143 L.Ed.2d 531 (1999); *United States v. Hibbler,* 159 F.3d 233, 237–38 (6th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1278, 143 L.Ed.2d 372 (1999); *United States v. Canada,* 110 F.3d 260, 263–64 (5th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 118 S.Ct. 195, 139 L.Ed.2d 133 (1997).

■ "This court applies the rules of statutory construction when interpreting the Sentencing Guidelines." *United States v. Fellows,* 157 F.3d 1197, 1200 (9th Cir. 1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 133, —— L.Ed.2d —— (1999). Under these rules, "we begin with the language of the statute itself, looking not only to the disputed provision, but also to the provisions of the whole law, and to its object and policy." *United States v. Butler,* 74 F.3d 916, 922 (9th Cir.1996) (internal quotation omitted), *cited in Fellows,* 157 F.3d at 1200. "Ultimately, the goal is to ascertain the intent of the drafters." *Fellows,*

157 F.3d at 1200. Examining the plain language of the Guidelines in accordance with these principles, we conclude that "distribution" under section 2G2.2(b)(2) requires an element of pecuniary gain. We agree with the *Black* court's suggestion, however, that this element may exist in a criminal transaction even if no cash has changed hands, so long as the offender acted to acquire something with economic value (such as goods or services).

Our first reason for concluding that section 2G2.2(b)(2) requires an element of pecuniary gain lies in Application Note 1 to section 2G2.2, which states in pertinent part that " '[d]istribution,' as used in this guideline, includes any act related to distribution for pecuniary gain, including production, transportation, and possession with intent to distribute." U.S.S.G. § 2G2.2, comment. (n.1). Because the word "includes," as used in the Guidelines, is not exclusive, *see* U.S.S.G. § 1B1.1, comment. (n.2), the "act[s] related to distribution for pecuniary gain" described in Application Note 1 do not constitute the entire universe of acts that count as "distribution" for purposes of section 2G2.2. Application Note 1 helps us define that universe, however, by mentioning acts of production, transportation, and possession that are related to distribution for pecuniary gain, while omitting identical acts that are related to delivery for nonpecuniary reasons. This distinction suggests that section 2G2.2(b)(2) covers only those acts of delivery, as well as delivery's supporting acts of production, transportation, and possession, that the defendant performs for pecuniary reasons. If the Guidelines' drafters intended section 2G2.2(b)(2) to penalize the person who gratuitously gives a single pornographic image to another person as severely as the commercial retailer of child pornography, we see no convincing reason why they would not similarly have chosen to penalize the former person's acts of production, transportation, and

---

4. In the course of deciding related issues, at least two other circuits have assumed that "distribution" in section 2G2.2 refers to activities undertaken for profit. *See United States*

*v. Stanton,* 973 F.2d 608, 610 (8th Cir.1992); *United States v. Deane,* 914 F.2d 11, 14 (1st Cir.1990).

possession. *See Black*, 116 F.3d at 202 (stating that government's interpretation of Application Note 1 to mean that section 2G2.2(b)(2) covers non-pecuniary distributions "strikes us as strained"). *But see Lorge*, 166 F.3d at 518 (interpreting word "includes" in Application Note 1 to mean that section 2G2.2(b)(2) covers deliveries motivated by non-pecuniary goals); *Hibbler*, 159 F.3d at 237 (same); *Canada*, 110 F.3d at 263 (same).

The structure of U.S.S.G. § 2G3.1 ("Importing, Mailing, or Transporting Obscene Matter"), a slightly differently worded Guideline discussed by the special concurrence, supports our conclusion that the Guidelines' drafters intended to impose the same punishment on those who deliver child pornography for profit and those who commit other acts, such as transportation, to further for-profit deliveries.[5] Section 2G3.1's structure parallels that of Section 2G2.2, as we interpret it: every offender who delivers, or commits acts assisting with the delivery of, pornography for profit receives an increase of five or more levels. The special concurrence compares these two Guidelines and concludes that although the Commission expressed its "clear choice to give heavier sentences to those who engage in child pornography offenses" by imposing a particularly heavy punishment on those who deliver child pornography gratuitously, it for some reason chose to spare those who possess, transport, or produce child pornography in order to deliver it gratuitously. Because we see no reason for the Commission to draw this distinction, we conclude that although section 2G3.1 and section 2G2.2's wording differs slightly, the two Guidelines express the same goal.

Second, as the Seventh Circuit pointed out in *Black*, section 2G2.2(b)(2) "measures the number of levels of an enhancement by the 'retail value of the material,' which implies a transaction for pecuniary gain." *Black*, 116 F.3d at 202. The *Lorge* court read the subsection differently, stating that the drafters included this language to ensure that the largest-scale distributors would receive higher sentences "tied to the value of the distributed material, not to modify the meaning of the term 'distribution.'" *Lorge*, 166 F.3d at 519. We are not persuaded that, as the *Lorge* court suggests, the drafters saw a need to distinguish between a commercial pornographer who sells $40,000 worth of material and one who sells $80,000 worth, but not between a person who gives away a magazine and one who markets $40,000 worth of magazines. We treat the plain language of section 2G2.2(b)(2) as evidence of the Guidelines' drafters' belief that a "distribution" enhancement requires a finding of a profit motive.[6]

Finally, our examination of the overall punishment scheme laid out in section 2G2.2 shows that section 2G2.2(b)(2) targets those who derive material benefit from their exploitation of children, such as commercial traffickers in child pornography. Section 2G2.2 assigns a base offense level of 15 to six types of offenses: trafficking, receipt, transportation, shipping, advertising, and possession with intent to traffic of material involving the sexual exploitation of a minor. If simple delivery of a piece of child pornography to one other person could trigger section 2G2.2(b)(2)'s five-level "distribution" increase, then only those offenders who merely received or advertised child pornography could receive

---

5. Section 2G3.1(b)(1) states "[i]f the offense involved an act related to distribution for pecuniary gain, increase by the number of levels from the table in § 2F1.1 corresponding to the retail value of the material, but in no event by less than 5 levels." Application Note 1 to section 2G3.1 states that " '[a]ct related to distribution,' as used in this guideline, is to be construed broadly and includes production, transportation, and possession with intent to distribute."

6. The Chairman of the Sentencing Commission has shared this view, writing in a letter to Congress that sentences under section 2G2.2 were "further increased by at least 5 levels if the offense involved *for-profit distribution.*" 137 Cong. Rec. H6736–02, H6737 (1991) (letter of William W. Wilkins, Jr., Chairman of the U.S. Sentencing Commission) (emphasis supplied).

the base offense level; all the other offenses covered by section 2G2.2 would qualify automatically for the five-level increase. Section 2G2.2's treatment of other specific offense characteristics reinforces our conclusion that subsection (b)(2) does not apply to a gratuitous delivery of pornographic material; subsection (b)(2)'s five-level increase is equal to that imposed for "a pattern of activity involving the sexual abuse or exploitation of a minor," U.S.S.G. § 2G2.2(b)(4), and one level greater than that imposed for "offense[s] involv[ing] material that portrays sadistic or masochistic conduct or other depictions of violence," *id.* § 2G2.2(b)(3). The most coherent interpretation of section 2G2.2 assigns a base offense level of 15 to all criminals who send and receive any amount of child pornography for any reason, while visiting a particularly heavy punishment upon those who profit from the exploitation of children. *See Deane,* 914 F.2d at 14 (concluding that section 2G2.2's base offense level applies to a "passive" violator who mailed three child pornography magazines to another person; relying on fact that subsection (b)(2) explicitly provided for an increased offense level for those who engaged in the "active conduct" of distribution for pecuniary gain).[7]

■ Having determined that section 2G2.2(b)(2) requires an element of "pecuniary gain," we turn to the question of the meaning of that term. "Pecuniary" means "consisting of money or *that which can be valued in money,*" Black's Law Dictionary 1131 (6th ed.1990) (emphasis added). One who acts to receive valuable property, like one who seeks to receive cash, therefore acts for "pecuniary gain." *See Black,* 116 F.3d at 202–03 ("[P]ecuniary gain is a

broad concept itself, and it does not exclude the possibility of swaps, barter, in-kind transactions, or other valuable consideration."). *Cf.* U.S.S.G. § 2Q2.1, comment. (n.1) (" 'For pecuniary gain' means for receipt of, or in anticipation of receipt of, anything of value, whether monetary or in goods or services. Thus, offenses committed for pecuniary gain include both monetary and barter transactions."). A person who delivers pornography in order to receive other pornography that has economic value acts for "pecuniary gain" and therefore engages in "distribution" for purposes of section 2G2.2(b)(2). *See, e.g., United States v. Muick,* 167 F.3d 1162, 1166 (7th Cir.1999) (finding that defendant had acted for "pecuniary gain," and therefore was subject to distribution increase under section 2G2.2(b)(2), because he had received pornographic computer files, as well as money, in exchange for pornography, and had set up his computer system to "require a computer user to 'barter' computer files before permission to download [defendant's] child pornography was granted"). If, as the district court found, Laney and his coconspirators expected to receive goods with "retail value"—other pornographic images—in return for the child pornography they provided to one another, the court did not err in imposing the five-level distribution increase.

■ We review the district court's findings of fact in the sentencing phase for clear error. *See United States v. Gutierrez–Hernandez,* 94 F.3d 582, 583 (9th Cir. 1996). The government must prove facts supporting the enhancement of a sentence by a preponderance of the evidence. *See United States v. Watts,* 519 U.S. 148, 156–57, 117 S.Ct. 633, 637–38, 136 L.Ed.2d 554 (1997). The record suggests that Laney

---

**7.** A recent statute shows that Congress would like the Guidelines to include deliveries of child pornography made for non-pecuniary reasons within the definition of "distribution." *See* Protection of Children from Sexual Predators Act of 1998, Pub.L. No. 105–314, § 506, 112 Stat. 2980, 2982 (reprinted in 28 U.S.C. § 994 historical notes) (directing the Sentencing Commission to review the Guidelines relating to the distribution of child por-

nography and "promulgate such amendments to the ... Guidelines as are necessary to clarify that the term 'distribution of pornography' applies to the distribution of pornography-(A) for monetary remuneration; or (B) for a nonpecuniary interest"). Until the Sentencing Commission promulgates such amendments, however, we must interpret the Guidelines as currently written.

and his coconspirators had multiple motivations for transferring images to one another. On the one hand, Laney clearly never expected to receive any money for his photographs of Jane Does Two and Three; he apparently sent them only to Riva and told Riva not to send them to any other Orchid Club member. Moreover, much of Laney's correspondence with Riva and other Orchid Club members is more in the nature of friends exchanging tips on a shared "hobby" than merchants carrying out a *quid pro quo* exchange. Although Laney told one correspondent that he would send his most private pictures only to those who sent pictures to him ("nope.. sorry.. the index file is very private ... only for those that have traded with me ... im am very particular about it ... don't want them getting out"), his refusal to send images to those who did not provide them may have stemmed from fear of being caught ("i've been on irc's trading for about almost 3 years ... and pretty much just trade with about 12 people that Ive known for a long time ... and even they don't get some of the private pics"). On the other hand, it appears that Orchid Club members had to provide something to the other members—images or stories—in order to enjoy the chief "benefit" of the club, access to generally unavailable child pornography. Certain conversations between members of the club also showed an element of barter. At one point, for example, Riva told Laney that he would "get some vids shot soon ... maybe trade copies." Because the record shows both pecuniary and nonpecuniary reasons for sending the images, we cannot say that the district court erred in imposing the five-level "distribution" increase pursuant to section 2G2.2(b)(2).

### B.

Laney argues that the district court should not have treated the on-line molestation of Jane Doe One as "relevant conduct" as to Laney under U.S.S.G. § 1B1.3. Relevant conduct used to determine a base offense level under the Guidelines includes "in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). "[T]he scope of the criminal activity jointly undertaken by the defendant ... is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." *Id.*, comment. (n.2). Although Laney did not have advance notice of or participate in the on-line molestation, the act was both reasonably foreseeable to him and "in furtherance of the jointly undertaken criminal activity," as section 1B1.3(a)(1)(B) requires. The Orchid Club existed so that members could share child pornography and advise one another on how to produce it. Laney knew that other members of the Orchid Club were making sexually explicit videotapes and other images of minors; he apparently joined the club and entered into private correspondence with Riva partly in order to receive these images; and he had produced such images himself. He therefore could foresee that other Orchid Club members would exploit children to make such images. More specifically, Laney could foresee the identity of the victim and some of the details of the exploitation: he knew that Riva had molested and intended to continue to molest Jane Doe One, and he had given Riva advice on how to perform particular sexual acts on her. The district court therefore did not err in finding that the on-line molestation constituted relevant conduct under section 1B1.3.[8]

---

8. Laney also claims that the district court made no express factual finding of reasonable foreseeability, an error that would require a remand. *See Gutierrez–Hernandez*, 94 F.3d at 585. The district court, however, adequately made such a finding: the judge explicitly adopted the factual findings of the presentence report and told Laney that "although I do recognize that you yourself were not ... present during the actual events ... you're responsible under the law for the conduct of

### C.

Laney argues that the district court erred, when determining the extent to which it would depart downward based on Laney's substantial assistance to the government, by denying Laney's motion for an evidentiary hearing and by otherwise failing to conduct an independent review of the degree of Laney's assistance. Laney sought to prove that he was entitled to a greater departure than that recommended by the government because, among other reasons, he incriminated more individuals than the government acknowledges. The government responds that we do not have jurisdiction to review the district court's determinations regarding the downward departure and that the district court did not abuse its discretion.

Under 18 U.S.C. § 3742(a), which states the grounds on which a defendant may appeal a sentence, a court of appeals ordinarily does not have jurisdiction to review the extent of a district court's discretionary downward departure from a sentence. *See United States v. Eureka Lab., Inc.,* 103 F.3d 908, 911 (9th Cir.1996); *United States v. Vizcarra–Angulo,* 904 F.2d 22, 23 (9th Cir.1990). Section 3742(a) does, however, grant us jurisdiction over an appeal of a sentence that "(1) was imposed in violation of law; or (2) was imposed as a result of an incorrect application of the sentencing guidelines," even if the alleged error involved a downward departure. *See Eureka Lab.,* 103 F.3d at 912 ("[A]n appeal from a sentence founded on a mistake of law is within our jurisdiction even if the dispute concerns the fact or extent of departure.") (quoting *United States v. Gomez,* 24 F.3d 924, 927 (7th Cir.1994)); *see also United States v. Martinez,* 905 F.2d 251, 254 (9th Cir.1990) ("[Defendant] does not assert the sentence imposed was in violation of law, involved an incorrect application of the guidelines,

[or was based on other] grounds upon which a defendant is expressly authorized to appeal. Absent such challenges we have no basis to review the district court's downward departure.") (citation omitted). For example, "[i]f the district court rests its decision not to depart downward on a determination that it does not have the authority to do so, we treat that decision as an interpretation of the Sentencing Guidelines and review it *de novo.*" *United States v. Eaton,* 31 F.3d 789, 793 (9th Cir.1994).

Laney claims that the district court erred by following an incorrect process to arrive at the five-level departure, and that we therefore have jurisdiction over his appeal because this error constituted a violation of law or misapplication of the Guidelines. *See United States v. Hill,* 70 F.3d 321, 324–25 (4th Cir.1995) (noting distinction between argument that downward departure was insufficient and argument that district court used an incorrect process to arrive at departure). Section 5K1.1 of the Guidelines, which sets out a number of factors that a court considering a government motion for a downward departure may take into account, directs the courts to evaluate "[t]he nature, extent, and significance of [a defendant's] assistance ... on an individual basis" and to "state the reasons for reducing a sentence under this section." U.S.S.G. § 5K1.1, comment. (backg'd). Cases in other circuits have held that a district court that fails properly to consider all of the factors relevant to a downward departure inquiry under section 5K1.1 commits a reviewable error of law or misapplies the Guidelines. In *United States v. King,* 53 F.3d 589, 591 (3d Cir. 1995), for example, the Third Circuit held that the district court had erred as a matter of law because it failed properly to conduct an "individualized qualitative examination of the incidents of the defen-

---

the coconspirators and indeed after the ... conduct had taken place, you tend[ed] to participate in overt acts that relate to that." *See United States v. Whitecotton,* 142 F.3d 1194, 1198 (9th Cir.1998) (stating that district court may make findings by specifically adopting

findings of presentence report); *United States v. Willis,* 899 F.2d 873, 875 (9th Cir.1990) (holding that district court need not use the exact "reasonable foreseeability" language used in Guidelines).

dant's cooperation," as required by section 5K1.1, *id.*, and instead appeared to have engaged in "a mechanical application of the guidelines," *id.* at 592. The *King* court concluded that this error of law resulted in appellate jurisdiction. *See id.* at 592 n. 4. *See also United States v. Johnson*, 33 F.3d 8, 10 (5th Cir.1994) (vacating and remanding for resentencing upon holding that district court had erroneously based downward departure on an inflexible policy of accepting government's recommendation).

▬▬▬ We need not reach the question, raised in *King* and *Johnson,* of whether we have jurisdiction over an appeal of a downward departure determination in which a district court failed to conduct a fully individualized determination under section 5K1.1, because we determine that the district court in this case conducted a proper section 5K1.1 inquiry. The record shows that the district court "adequately recognized its duty to evaluate independently [each individual] defendant's case," *Johnson*, 33 F.3d at 10. At the sentencing hearing, the court heard Laney's reasons for a 10–level downward departure.[9] Although the district judge stated that "[i]t is the court's practice to give deference to the judgment of the government with respect to the amount of departure when the basis of the departure is the cooperation of a defendant ... because it's very difficult for the court to second-guess the value of that cooperation," this practice did not in itself violate the Guidelines, which state that the government's evaluations should have "[s]ubstantial weight ...

particularly where the extent and value of the assistance are difficult to ascertain," U.S.S.G. § 5K1.1, comment. (n.3). After hearing Laney's arguments, the court stated that "there seems to be a reasonable basis for the kind of assessment that [the government made]" and accepted the government's recommendation. "Just because the district court did not entertain a particular argument does not necessarily mean it did not consider all of the grounds presented to it in [a] motion for downward departure." *United States v. Riggins,* 40 F.3d 1055, 1058 (9th Cir.1994). The district court did not violate the Guidelines by giving the government's arguments greater weight than Laney's. Because we lack jurisdiction to review the amount of the departure itself, we affirm this aspect of the sentence.

### D.

▬▬▬ Laney challenges the restitution order, claiming that the government did not show a close enough causal connection between his actions and Jane Doe One's injuries to make him liable to pay restitution to her. In response, the government suggests that conduct that is reasonably foreseeable enough to constitute relevant conduct under U.S.S.G. § 1B1.3 will make a defendant liable to pay restitution under section 2259.[10] This circuit has not yet determined the reach of section 2259, which requires a sentencing court to order a defendant convicted of a crime involving the sexual exploitation of children to pay restitution to the victim of that crime.[11] We review the legality of an or-

---

9. The court did not abuse its discretion by denying Laney's motion for an evidentiary hearing. "A district court may permissibly deny a hearing where a defendant is allowed to rebut the recommendations and allegations of the presentence report either orally or through the submission of written affidavits or briefs." *United States v. Sarno,* 73 F.3d 1470, 1502–03 (9th Cir.1995). Because Laney's counsel submitted a detailed declaration in support of the request for an evidentiary hearing and made a lengthy oral presentation on the record explaining why Laney believed the government had underestimated the value of his assistance, the court could reasonably

have found that an evidentiary hearing would have "had little value," *United States v. Robinson,* 35 F.3d 442, 450 (9th Cir.1994).

10. Laney also argues that the restitution order was erroneous for two other reasons: because Jane Doe One's molestation was not reasonably foreseeable to him and because the district court did not make findings of fact on the amount of Jane Doe One's injuries proximately caused by Laney. We find these arguments without merit.

11. Section 2259 states in relevant part:

der of restitution *de novo. United States v. Rutgard,* 116 F.3d 1270, 1294 (9th Cir. 1997).

■ Section 2259 does not make a defendant automatically liable to pay restitution for every crime that forms part of that defendant's "relevant conduct" under U.S.S.G. § 1B1.3. A comparison of the language of the Guidelines and section 2259 shows that a court may hold a defendant responsible for a broader range of harms connected with the defendant's crimes when it calculates a sentence than it may consider when it crafts a restitution order. Section 1B1.3 of the Guidelines does not require a causal connection between a defendant's acts and that defendant's relevant conduct. It merely states that, in the case of jointly undertaken criminal activity, "whether or not charged as a conspiracy," relevant conduct must be "reasonably foreseeable" and "in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Section 2259, on the other hand, incorporates a requirement of proximate causation: It states that the defendant shall pay "restitution for any offense" to the "victim" of the offense. It defines a "victim" as "the individual harmed *as a result of* a commission of a crime under this chapter," 18 U.S.C. § 2259(c) (emphasis added), and states that restitution shall compensate for "the full amount of the victim's losses," *id.* § 2259(b)(1), which includes medical costs, lost income, and "any other losses suffered

by the victim *as a proximate result of* the offense," *id.* § 2259(b)(3)(F) (emphasis added). *See also United States v. Crandon,* 173 F.3d 122, 125–26 (3d Cir.) (considering whether defendant had engaged in "conduct [that] was the proximate cause of" the victim's injuries and therefore was liable to pay restitution under section 2259), *cert. denied,* —— U.S. ——, 120 S.Ct. 138, —— L.Ed.2d. —— (1999).

■ Section 2259 therefore requires a causal connection between the offense of conviction and the victim's harm. When the offense of conviction is conspiracy, however, the harms the offense caused may include not only those resulting from the defendant's individual actions, but also others caused by the conspiracy itself. *See United States v. Fonseca–Caro,* 114 F.3d 906, 907 (9th Cir.1997) ("[A] co-conspirator is vicariously liable for reasonably foreseeable substantive crimes committed by a co-conspirator in furtherance of the conspiracy.") (citing *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)), *cert. denied,* —— U.S. ——, 118 S.Ct. 895, 139 L.Ed.2d 880 (1998). As the Tenth Circuit has explained,

a conspiracy participant is legally liable for all reasonably foreseeable acts of his or her coconspirators in furtherance of the conspiracy.... [T]he losses caused by the entire conspiracy, not just the

(a) **In general.**—Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.

(b) **Scope and nature of order.—**

(1) **Directions.**—The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court pursuant to paragraph (2).

(2) **Enforcement.**—An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.

(3) **Definition.**—For purposes of this subsection, the term "full amount of the victim's losses" includes any costs incurred by the victim for—

(A) medical services relating to physical, psychiatric, or psychological care;

(B) physical and occupational therapy or rehabilitation; [and]

. . . . .

(F) any other losses suffered by the victim as a proximate result of the offense.

. . . . .

(c) **Definition.**—For purposes of this section, the term "victim" means the individual harmed as a result of a commission of a crime under this chapter....

losses caused by those acts committed by the defendant, can be attributed to the defendant when the district court orders restitution.

*United States v. Brewer,* 983 F.2d 181, 185 (10th Cir.1993) (discussing a different restitution statute, 18 U.S.C. § 3663). Because Laney pled guilty to participating in a conspiracy and the reasonably foreseeable actions taken by his coconspirators in furtherance of the conspiracy injured Jane Doe One, we find no error in the district court's decision to order restitution.

### E.

Finally, Laney challenges the district court's determination of the amount of restitution ordered. Part of the $60,000 restitution was to cover future psychological treatment and counseling for Jane Doe One and her family. Jane Doe One's psychiatrist helped calculate these amounts, estimating that the treatment would last six years. Laney contends that section 2259 does not authorize compensation for amounts that the victims have not yet spent.[12] No circuit yet has addressed this question.

■ "We review the amount of a restitution order for abuse of discretion, provided that it is within the bounds of the statutory framework." *United States v. Johnson,* 132 F.3d 1279, 1286 (9th Cir. 1997). Trial courts have broad discretion in ordering restitution. *See United States v. Miguel,* 49 F.3d 505, 511 (9th Cir.1995).

■ Compensable losses under section 2259 include the cost of the victim's "medical services relating to physical, psychiatric, or psychological care," 18 U.S.C. § 2259(b)(3)(A), and "physical and occupational therapy or rehabilitation," *id.* § 2259(b)(3)(B). Courts are to issue and enforce restitution orders under section 2259 "in accordance with [18 U.S.C. § ] 3664." *Id.* § 2259(b)(2). Section 3664(d)(5), in turn, provides a mechanism for a victim to approach the court after sentencing and request restitution for losses that were not ascertainable at the time of sentencing.[13]

The language of the relevant statutes shows that Congress intended to allow district courts to include future counseling expenses in the amount of restitution under section 2259. Section 2259 is phrased in generous terms, in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse. Section 2259 orders compensation for costs "incurred by the victim." "Incur" means "become liable or subject to," Webster's Third New Int'l Dictionary 1146 (1986); a person may become "subject to" an expense before she actually disburses any funds. Section 2259 also commands that those who are convicted of sexually exploiting children should compensate their victims for the cost of "physical, psychiatric, or psychological care." Congress was well aware that children victimized by sexual abuse often do not recover quickly from their injuries. *See, e.g.,* S.Rep. No. 104–358, at 14 (1996) (describing long term effects of sexual exploitation on its victims).

Section 3664, which Laney cites as evidence that Congress created a mechanism for compensating for the cost of future therapy, deals with losses that are not "ascertainable" at the time of sentencing. Jane Doe One's counseling costs are "ascertainable" and have, in fact, been ascertained, even though she and her parents have yet to spend the money. Section

---

**12.** *See supra* note 11 for the text of section 2259.

**13.** Section 3664(d)(5) states:

If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

3664 directs victims who "discover" further losses to petition the court for an amended restitution order, and states that the court may grant such an order only if the victim shows good cause for failing previously to inform the court of the loss. Jane Doe One and her family will not "discover" in the future that they need counseling; they already know that they do. Finally, if Congress intended crime victims who required long-term psychological or physical therapy to receive restitution only after they actually paid their therapists, it created a strangely unwieldy procedure in section 3664, which would require a victim to petition the court for an amended restitution order every 60 days for as long as the therapy lasted.

For these reasons, we reject Laney's construction of section 2259. We hold that the district court did not err in interpreting the statute to allow restitution for future counseling and did not abuse its broad discretion, within the statutory framework, in setting the amount of restitution.[14]

### III.

For the foregoing reasons, the district court's judgment of December 22, 1997, is

AFFIRMED.

T.G. NELSON, Circuit Judge, specially concurring:

In this case, we encounter an existing circuit split. Although Yogi Berra enjoined us, "when you come to a fork in the road, take it," I believe we have chosen the wrong path here.

Sentencing guideline § 2G2.2 provides for enhancements to sentences of persons convicted of receiving, transporting, shipping or advertising materials involving the sexual exploitation of minors. According to the guideline, a sentence can be enhanced "[i]f the offense involved distribution." U.S.S.G. § 2G2.2(b)(2). Application Note 1 provides that: " 'Distribution' includes any act related to distribution for pecuniary gain, including production, transportation, and possession with intent to distribute." *Id.* comment. (n.1). The majority accepts the reasoning of *United States v. Black,* 116 F.3d 198, 202–03 (7th Cir.1997), to conclude that "distribution," as it is used in Section 2G2.2(b)(2), requires an element of pecuniary gain. I believe that this unwarrantedly restricts the reach of the guideline and therefore concur only in the result reached in Part II.A of the opinion.

Because this road has had previous traffic on it, I do not need to blaze a new trail. Rather, I believe the analysis of the Second Circuit in *United States v. Lorge,* 166 F.3d 516 (2d Cir.1999), articulates the correct interpretation of Section 2G1.1(b)(2). In *Lorge,* the court explained that:

> The language of the Guidelines makes clear that the definition of "distribution" in Section 2G2.2(b)(2) is not limited by Application Note 1 thereof to acts for "pecuniary gain." Because Section 1B1.1 states that the term "includes" is not exhaustive, the language of Application Note 1 ... is most easily read as intended to avoid an overly narrow reading of distribution that excluded acts ancillary to sales, such as transportation. Moreover, the structure of Section 2G2.2 also supports the inference

---

14. Of course, district courts must estimate the amounts that victims will spend on future counseling with reasonable certainty, in accordance with the procedures set forth in 18 U.S.C. § 3664. In many cases, an order of restitution for future losses may be inappropriate because the amount of loss is too difficult to confirm or calculate. *See, e.g., United States v. Fountain,* 768 F.2d 790, 801–02 (7th Cir.1985) (reversing a restitution award, granted under a different restitution statute, that compensated for an injured victim's lost future wages; stating that "the difficult[y] ... of translating an uncertain future stream of earnings into a present value" means that "projecting lost future earnings has no place in criminal sentencing if the amount or present value of those earnings is in dispute"). In this case, however, because the government's estimate of the amount was well-supported and exact, and because Laney did not contest it, the district court did not need to engage in any arbitrary calculations.

that a motive of pecuniary gain need not be shown. Subsection (b)(2) provides for an enhancement "[i]f the offense involved distribution." The ordinary meaning of distribution involves an act or series of acts without regard to the actor's motive. Application Note 1, which provides, *inter alia*, that the term distribution "includes any act related to distribution for pecuniary gain," makes clear that when the profit motive is present, not only "distributions," as the term is commonly understood, but also "any act" related thereto, "including production, transportation, and possession with intent to distribute," suffices to sustain the enhancement.

... Moreover, the fact that Section 2G2.2(b)(2) cross-references the table in Section 2F1.1 setting forth incremental offense-level enhancements based on the amount of monetary loss does not support appellant's argument.... The purpose of the reference to the table in Section 2F1.1 is clearly to provide for increased distribution enhancements tied to the value of the distributed material, not to modify the meaning of the term "distribution."

*Id.* at 518–19 (citations omitted); *see also United States v. Hibbler,* 159 F.3d 233, 237–38 (6th Cir.1998) ("[T]he enhancement provided for in § 2G2.2(b)(2) is not limited to instances involving distribution for pecuniary gain."); *United States v. Canada,* 110 F.3d 260, 263 (5th Cir.1997) (" '[D]istribution' for the sake of the guideline is meant to be inclusive of pecuniary gain purposes, but not exclusive of all other purposes.").

Contrary to the dissent, application of the enhancement to any and all trades of child pornography is not suspect or contrary to the guidelines. The sentencing guidelines distinguish between receiving and distributing child pornography. *Hibbler,* 159 F.3d at 238. The baseline offense covers the receipt and possession of child pornography. However, if a defendant has distributed child pornography, a five-level sentence increase is imposed. If a defendant has distributed child pornogra-

phy with a value greater than $70,000, incremental enhancements are imposed in relation to the value of the child pornography distributed. "The guidelines, therefore, mandate a continuum of punishment correlated to the value of the distributed materials." *Id.*

Notably, Section 2G3.1, the sentencing guideline for the similar, but lesser offense of "importing, mailing, or transporting obscene matter" also includes a five-level increase, but specifically for an act related to distribution for pecuniary gain. Section 2G3.1 states that "[i]f the offense *involved an act related to distribution for pecuniary gain,* increase the number of levels from the table in § 2F1.1 corresponding to the retail value of the material, but in no event less than 5 levels." U.S.S.G. § 2G3.1(b)(1) (emphasis added). In contrast, Section 2G2.2, for child pornography, applies if the offense merely "involved distribution." This is clearly broader language. Thus, mere distribution of child pornography results in a five-level enhancement, whereas distribution of pornography that does not include depictions of children must be for pecuniary gain in order to result in a five-level increase. This distinction is logical. To interpret Section 2G2.2(b)(2) to require pecuniary gain negates a clear choice to give heavier sentences to those who engage in child pornography offenses.

Thus, I do not believe that the enhancement for distribution under Section 2G2.2(b)(2) is limited to those circumstances where the Government can show that the act was for pecuniary gain. While the majority has reached the correct endpoint in finding that the enhancement of Laney's sentence was not clearly erroneous, it has taken a path which limits the intended and proper reach of the guideline. As such, I concur only in the result reached in Part II.A of the opinion.

REINHARDT, Circuit Judge, concurring in part and dissenting in part.

Although I concur in the majority opinion in all other respects, I disagree with

Judge Kravitch's interpretation of the term "for pecuniary gain" as it is used in connection with Sentencing Guideline § 2G2.2. For that reason, I dissent from the majority's affirmance of the five level increase in the sentence.

Judge Kravitch and I agree that "distribution," for purposes of § 2G2.2, means distribution for pecuniary gain. We believe that meaning to be clear from the text of Application Note 1, which states that " 'distribution' includes any act related to distribution for pecuniary gain...." But, Judge Kravitch then concludes that the requirement that the distribution be "for pecuniary gain" is satisfied so long as the offender in question receives something that has monetary value in exchange. Here, we part company. I believe that the phrase "for pecuniary gain" applies when the offender in question has acted to acquire something with monetary value *because of* that value—put another way, when the offender's actions are *motivated,* at least in substantial part, by a desire for profit.

Thus, while I agree with Judge Kravitch and the Seventh Circuit in *Black* that distribution *for* pecuniary gain can include a variety of acts, such as barters, swaps, and trades, I believe that in order to qualify for the enhancement, those acts must be *motivated* by a desire for economic benefit. In contrast, Judge Kravitch would find that "[a] person who delivers pornography in order to receive other pornography that has economic value acts for 'pecuniary gain' and therefore engages in 'distribution' for purposes of Section 2G2.2(b)(2)." Thus, Judge Kravitch's interpretation of the Guidelines would in essence read the word "for" out of the Application Note.

*Webster's New World Dictionary* defines "for" as: "with the aim or purpose of ...; in order to ... get, have, keep, etc., because of...." *Webster's New World*

*Dictionary, Third College Edition* (3d ed.1988). The plain meaning of the Note, therefore, is that to act for pecuniary gain is to act *in order to* obtain pecuniary gain-that, simply put, pecuniary gain must be the motive for the act. A person who exchanges pornography for more pornography *may* be acting for pecuniary gain, but he *may* also be acting out of an entirely different motivation wholly unrelated to a desire for profit—specifically, he may be acting out of a desire for personal pleasure or gratification. To me, acting for the latter purpose is *not* acting "for pecuniary gain," even though pecuniary gain may be an incidental benefit of the transaction.[1]

In my view, the profit (or economic benefit) motive is an essential element of an act *for* pecuniary gain, for two reasons—in addition to the fact that such is the plain meaning of the Application Note. First, any other reading would mean that any one in possession of child pornography who trades pictures with acquaintances for mutual satisfaction or gratification would automatically qualify for the same five level enhancement that would be received by commercial venturers who sell child pornography for money, or who, in hopes of escaping detection or prosecution, exchange or barter pornographic materials for other items that have a significant economic value. Second, to construe distribution as applying to transactions that are motivated by considerations unrelated to economic benefit would leave nothing to be covered by the base offense level other than the acts of the rare individuals who on occasion make gifts of pornographic pictures to similarly-inclined acquaintances, without any hope or expectation that those acquaintances will return the favor—a very small class indeed.

The Chairman of the Sentencing Commission has confirmed that the five level enhancement was intended to include *only*

---

1. Thus, while Judge Kravitch and I would agree that the five level enhancement applies to someone who trades one set of pornographic images for another for the purpose of obtaining some economic benefit, she would also hold that the five level enhancement applies to a person who makes the same trade solely for the purpose of his own personal gratification and regardless of any incidental economic benefit that may accrue.

for-profit distribution. As Judge Kravitch notes in her opinion, Chairman Wilkins stated that sentences under § 2G2.2 were "further increased by at least five levels if the offense involved *for-profit distribution.*" 137 Cong. Rec. H6736–02, H6737 (1991) (letter of William W. Wilkins, Jr., Chairman of the U.S. Sentencing Commission) (emphasis added).

Contrary to Judge Nelson's special concurrence, a comparison of the sentencing guidelines concerning child pornography with those concerning other forms of pornography, i.e. "obscenity," demonstrates clearly that in both categories of cases the Sentencing Commission's intention in imposing a five level increase was simply to have that increase apply whenever the distribution of the material was "for pecuniary profit." A reading of the two relevant sections should make that clear. Moreover, while Judge Nelson's "logical" justification for his position—namely, that the Commission intended to give heavier sentences to those who engage in offenses involving child pornography—accurately describes the Commission's desires, it does not in any way support Judge Nelson's position. The Commission's intent to punish child pornography more severely is manifested by its establishment of a higher base level of punishment for that offense. In fact, the Commission established a far higher base level for trafficking in child pornography than for trafficking in obscene material not involving children (15 for trafficking in child pornography; and 10 for importing, mailing or transporting obscene matter). The Commission therefore had no cause to, and did not, create nice distinctions regarding the use of the term "distribution" in its child pornography and obscenity guidelines in order to provide for heavier penalties for child pornography. Instead, having already recognized the difference in the seriousness of the two offenses by imposing different base level sentences, the Commission then provided that the punishment for each type of offense (both more serious and less serious) would be increased by five levels whenever any of the crimes were committed for pecuniary gain. In short, under the Sentencing Guidelines, those who engage in distribution of child pornography, whether for pecuniary gain or not, do in fact receive heavier sentences than those who engage in the trafficking of obscenity under similar circumstances. As a result, Judge Nelson's argument that interpreting § 2G2.2(b)(2) to require pecuniary gain "negates a clear choice to give heavier sentences to those who engage in child pornography offenses" is plainly not correct.

Finally, Judge Nelson's suggestion that § 2G2.2's base offense level is intended to deal simply with "receipt" is inconsistent not only with the Commission's specification of the acts covered by that section—namely, "Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic"—but with the related Guidelines sections such as § 2G2.4, which only two sub-sections later establishes a lower base level for *possession* of the same materials. Because possession, as described in § 2G2.4 includes subcategories such as possession of ten or more books, magazines or periodicals, it is clear that in most instances, possession will involve the prior receipt of the child pornography by the defendant. The purpose of Section 2G2.2 is to deal with (and punish more severely) persons engaged in more than simple possession (including prior receipt)—specifically, it is intended to levy the appropriate punishment on persons who engage in "trafficking"—a far more pernicious activity. Once that concept is understood, it follows inevitably that the five level increase is intended to apply to people who traffic *for pecuniary gain.*

The business of child pornography feeds off of the victimization of children. I believe that the Sentencing Commission intended to distinguish (and punish with

particular severity) those who make a profit out of the exploitation of children from those who are essentially consumers; who simply exchange pornography with other consumers; who, for reasons that most of us have enormous difficulty fathoming (but are certainly non-pecuniary), derive personal pleasure and gratification from viewing the illicit materials. All of the evidence shows that Laney falls into the latter category. For these reasons, I would reverse the district court's five level enhancement under § 2G2.2.