UNITED STATES of America,
Plaintiff–Appellee,

v.

Dallas NEWSOME, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Michael Newsome, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Denzil Grant, Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Ernest Ray Brant, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Michael Newsome, Defendant–
Appellant.

Nos. 01–4542, 01–4841, 01–4543,
01–4842 and 01–4819.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 2002.

Decided Feb. 27, 2003.

**ARGUED:** Robert James O'Brien, Buckhannon, WV; Scott Allen Curnette, Curnette Law Office, Elkins, WV, for Appellants. Sherry L. Muncy, Assistant United States Attorney, Clarksburg, WV, for Appellee. **ON BRIEF:** Dwight R. Hall, Beverly, WV, for Appellant Michael Newsome; Jessica M. Baker, Jory & Smith, Elkins, WV, for Appellant Brant. Thomas E. Johnston, United States Attorney, Clarksburg, WV, for Appellee.

Before WILKINS, Chief Judge, and NIEMEYER and KING, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Chief Judge WILKINS and Judge KING joined.

## OPINION

NIEMEYER, Circuit Judge.

Ernest Ray Brant, Denzil Grant, Dallas Newsome, and Michael Newsome were convicted of participating in a conspiracy to cut down and steal black cherry trees from the Monongahela National Forest in West Virginia, causing the United States a total loss of $248,459.53. Brant, Grant, and Dallas Newsome were also convicted of various substantive theft offenses. Brant and Grant were sentenced to 46 months' imprisonment; Dallas Newsome to 15 months' imprisonment; and Michael Newsome to 4 months' confinement in a halfway house. All four defendants were ordered jointly and severally to pay restitution in the amount of $248,459.53.

On appeal, the defendants raise various issues challenging their convictions as well

as the amount of loss used in sentencing and for restitution. For the reasons that follow, we affirm.

## I

Beginning in December 1998 and continuing until July 2000, officials of the United States Department of Agriculture's Forest Service discovered that black cherry trees were being cut down and the prime portions consisting of the lower 15 to 20 feet of the trees—the "butt logs"—removed from the Monongahela National Forest without permission of the Department of Agriculture. Black cherry wood is prized in furniture making for its appearance and strength and therefore is commercially valuable. The black cherry trees in the forest are also valuable for their contribution to the habitat, and their fruit provides food for the wildlife in the over 900,000 acres constituting the Monongahela National Forest.

Special agents of the Department of Agriculture's Forest Service discovered approximately 25 sites in the Monongahela National Forest from which a total of 95 large trees had been cut down, some with diameters at the base of up to 40 inches, and the valuable portions removed from the National Forest. The evidence left at each of the sites indicated use of a similar *modus operandi* that was distinctive. At the location of the two or three stumps found at each site, only the most valuable butt portion of the trees had been removed, and secondary but still useful logs were left behind. At many sites, the stumps were superficially covered with branches and mud. Moreover, at each site there were similar drag marks on the ground, truck-tire tracks, and telltale chain marks on a nearby tree about eight feet above the ground, with scar marks on the same tree at about three to four feet above the ground, indicating the unorthodox

method by which the logs were removed. The special agents testified that these markings indicated that the logs were dragged to a nearby tree where a pulley was chained to the tree at about eight feet above the ground and used to raise the logs from the ground onto flatbed trucks. The trees' scar marks at three to four feet above the ground indicated where the logs hit the trees as they were being raised and loaded onto the trucks. At each site the thieves left behind the same type of debris: Budweiser brand beer cans, cigarettes, food wrappers, and "spit cups." At none of the sites was there evidence of skidders—special tractors—that professional loggers use to harvest trees. Professional loggers, who receive permits to harvest trees, drag the trees with skidders to a central location where the logs are piled and later loaded onto trucks by cranes called cherry pickers. Because of the distinctive *modus operandi* evidenced at each of the 25 sites from which black cherry trees were stolen, the special agents concluded that the same persons were involved in the thefts of the cherry trees from all 25 sites.

Based on anecdotal evidence from witnesses, who testified to observing trucks with logs on them leaving the forest and driving in the area, and on testimony of employees at local mills that purchased black cherry logs, special agents developed a list of suspects on whom to focus. Three nearby mills cooperated by providing, on an ongoing basis, the names of persons on the suspect list who were selling black cherry logs to the mills. After two of the mills continued to purchase small numbers of black cherry logs, they tagged each of the logs, as was their routine, and called the agents. Using the mills' records and receipts, the agents were able to establish who sold each of the black cherry logs to the mills and to whom the mill paid checks

for the purchase of the logs. The agents photographed the logs, obtained slabs cut from the butt ends of each log—known as "cookies"—and marked the cookies with the information received from the mill records about who sold the logs to the mill. The agents then took the cookies to the National Forest where they were able to match up the cookies with stumps.

Based on this investigation, seven persons, including the four defendants in this appeal, were indicted for participation in a conspiracy that began in December 1998 to "steal[,] purloin and knowingly convert to their own use and to the use of each other, a thing of value of [the United States], that is Black Cherry trees in violation of Title 18, United States Code, § 641." The defendants were also charged variously in 12 additional substantive counts of theft. Following a six-day jury trial, the jury found Brant, Grant, Dallas Newsome, and Michael Newsome guilty of conspiracy as charged in Count I. They also found Brant, Grant, and Dallas Newsome guilty on various substantive counts of theft. They acquitted Michael Newsome of the one substantive count of theft alleged against him. Finally, the jury acquitted the other three individuals named as defendants in the indictment.

At sentencing, the district court determined that the amount of loss caused by the conspiracy was $248,459.53, based on the market value of the 95 trees that were cut down and stolen. Using that amount of loss, the court sentenced Brant and Grant to 46 months' imprisonment. Based on a finding that the conspiracy caused a loss of $32,321.52 during the period when Dallas Newsome was a member, the court sentenced Dallas Newsome to 15 months' imprisonment. Based on the conclusion that Michael Newsome was not involved in any particular theft and that the amount he had stolen was therefore less than

$1,000, the district court followed § 641's loss-based distinction between felony and misdemeanor convictions and sentenced Michael Newsome as a misdemeanant, imposing four months' home confinement. Finally, under the Mandatory Victims Restitution Act, the court ordered that all four defendants jointly and severally make restitution to the United States in the amount of $248,459.53, the amount of loss that the conspiracy caused to the United States.

These four appeals followed.

## II

Grant, Brant, and Michael Newsome contend first that the district court improperly denied their motions for acquittal alleging that the government's evidence was insufficient to convict them of either theft or conspiracy to commit theft. They concede that the facts would permit a rational jury to find beyond a reasonable doubt that these defendants *possessed* black cherry logs which had been stolen from the Monongahela National Forest. But they argue that there was simply no evidence showing that any of the defendants "felled trees" in the National Forest or stole them. They assert, "Not one of [the witnesses] testified that he saw the appellants with chainsaws, oil, or fuel.... The fact that none of the witnesses saw any tangible item even suggesting logging rather than mere possession is significant." They conclude, arguing that "the Grand Jury did not charge the Appellants with merely possessing the logs or selling them: the Grand Jury expressly charged the Appellants with stealing the logs by chopping down the black cherry trees in the [Monongahela National Forest]. Deviation from that charge would result in a fatal variance."

The defendants made this same argument to the jury, explicitly distinguishing possession from theft and arguing that the

evidence showed merely that they possessed or sold the cherry trees, not that they stole them from the National Forest. The jury rejected the argument, as do we.

■ The evidence showed that the cookies taken from 21 logs sold by the defendants to the mills matched the stumps of trees illegally harvested from the Monongahela National Forest. The evidence also showed (1) that all 25 sites of stolen trees were harvested in a similarly distinctive manner, using chains and trucks in a particular way to remove the logs; (2) that the manner was unlike the usual professional method of logging; (3) that only the butt logs were taken even though secondary logs were valuable and available; (4) that at many sites the stumps were covered with debris and mud; and (5) that at each site similar debris was left. Moreover, witnesses from the mills implicated the defendants by name and identified them in court. Rick Stricker, an employee at one of the mills, testified that he bought black cherry logs, two or three at a time, from Brant and Grant. He testified that he bought the logs two or three times a month for several months and that among the others who came with Brant and Grant was someone named Newsome. Scott Schaffer who worked at the same mill testified that he purchased black cherry logs from the defendants, positively identifying Brant and Grant as selling the logs. Dan Lantz, who worked at another cooperating mill, testified that he often bought high-grade black cherry logs from several of the defendants. He identified Brant, Grant, Michael Newsome, and Dallas Newsome. He testified that these individuals sometimes brought as few as one or two logs and sometimes as many as six or seven, often at least twice a week.

Finally, there was evidence closely linking the timing of the removal of the trees from the National Forest and their sale to the mills. Evidence showed that the trees discovered to have been cut down and stolen from the Cranberry Visitors Center around Memorial Day were sold by the defendants to the mills on May 24, May 30, and June 6 in close temporal proximity to their thefts. The government put on evidence that the logs were huge and heavy and gave the jury a demonstration that revealed how difficult it would be to place even two of these heavy logs on a truck, showing that the logs were not items that could easily be moved and transferred from person to person. Moreover, we have long recognized that possession of recently stolen property permits an inference of theft. *See United States v. Long,* 538 F.2d 580 (4th Cir.1976). Here not only was there evidence that the defendants possessed recently stolen property, but also that they possessed property that was difficult to load onto trucks and that had been loaded onto trucks during virtually the same period that they were sold to the mills.

■ We conclude that the jury had sufficient evidence from which to find the defendants guilty of both conspiracy to steal black cherry trees and actual theft. The standard governing our review is whether "there is substantial evidence, taking the view most favorable to the Government, to support [the jury verdict]," *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and we have defined "substantial evidence," in the context of a criminal action, as that evidence which "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt," *United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996). Moreover, it is well established that facts may be proven by both circumstantial and direct evidence. *Id.* at 858; *United States v. Jackson,* 863 F.2d 1168, 1173 (4th Cir.

1989). We agree with the district court's conclusion that the government carried its burden.

## III

Challenging his conviction, Dallas Newsome contends (1) that the district court erred in denying his motion to suppress evidence and (2) that the district judge demonstrated judicial bias toward him. We address these points separately.

### A

Dallas Newsome contends first that the government should have retained the logs from which it cut the cookies. Because the government did not seize and preserve the whole logs, they were processed by the mills into veneer. Dallas Newsome contends that therefore "[w]e have only the word of the [mill] employees that the logs examined by law enforcement officials are the same as the logs the defendant delivered."

 Although the government has a duty to preserve evidence that possesses "an exculpatory value that was apparent before the evidence was destroyed" where "the defendant would be unable to obtain comparable evidence by other reasonably available means," *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the defendant must show bad faith on the part of the government to demonstrate a violation of due process, *see Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *Holdren v. Legursky,* 16 F.3d 57, 60 (4th Cir.1994). Dallas Newsome has presented no authority that would impose on the government a duty to seize the stolen logs, particularly when the government photographed them and retained a cookie from each of them.

 All of the evidence suggests that in this case the government acted according to an ordinary and reasonable protocol in its investigatory practices, and no evidence suggests any bad faith. As a result of this protocol, Dallas Newsome had the opportunity to view the photographs and to inspect the cookie that was cut from each log. Moreover, he also had access to the mill records retained in the ordinary course of its business. Finally, he had the opportunity to cross-examine mill employees as well as the special agents for the Department of Agriculture's Forest Service. Nothing in the record suggests that the logs that Dallas Newsome would have had the government seize and preserve had any exculpatory value so as to support a due process claim. Indeed, it appears that they would have provided no additional evidentiary value. Thus, no error was committed by the district court in denying Dallas Newsome's motion.

### B

Dallas Newsome also contends that the district judge acted with bias toward him during his counsel's closing argument and thereby violated the judge's duty "to conduct a jury trial 'in a general atmosphere of impartiality.'" *United States v. Castner,* 50 F.3d 1267, 1272 (4th Cir.1995) (citation omitted). The relevant exchange took place as follows:

> MR. O'BRIEN: And if Dallas Newsome had had an opportunity to go to that log yard, he might have said that this is my log over here, cut a "cookie" off of it and I will show you what you can match it to on that ridge above my house. But the logs have been shipped off and sliced into little pieces. He was never given an opportunity to defend himself.

THE COURT: Now, I will stop you at that point, Mr. O'Brien. You have exceeded the bounds of what you can do with that argument.

Dallas Newsome did not challenge this exchange during the course of trial, and he raises it for the first time on appeal. Accordingly, our standard of review is for plain error. *See* Fed.R.Crim.P. 52(b).

■■■ Because counsel for Dallas Newsome was suggesting in this statement to the jury some impropriety by the United States, a position that counsel never established in court, the district court appropriately concluded that the argument that counsel was making had limited value and may have been unfair. Moreover, the argument that the mill may have also possessed legal logs sold by the defendant was irrelevant to whether the logs in question were stolen. But even if it could be shown that the district court's interruption amounted to plain error—not something that we conclude—Dallas Newsome has not shown any prejudice resulting to him from the statement. Accordingly, we find his argument without merit.

### IV

Finally, all defendants contend that the district court erred in determining the amount of loss, both for the purpose of applying the Sentencing Guidelines and for the purpose of ordering restitution. The court found that for purposes of determining the proper offense level and imposing terms of imprisonment, Brant and Grant were responsible for a loss of $248,459.53; Dallas Newsome was responsible for $32,321.52; and Michael Newsome was responsible for less than $1,000. For purposes of ordering restitution, however, the court found that each defendant was jointly and severally responsible to the United States for the full amount of the loss caused by the conspiracy—$248,459.53. Because the defendants' arguments challenging these applications differ, we address them separately.

### A

Grant, Brant, and Michael Newsome contend that the evidence does not support the $248,459.53 loss found by the district court, whether for the purpose of computing the proper offense level under the Sentencing Guidelines or for the purpose of ordering restitution. While these defendants acknowledge that the government showed a loss of 95 trees at 25 sites, they contend that these numbers "dramatically exceed the sites and trees referenced in the substantive counts [Counts II–XIII] of the indictment; Forester Wells' valuation of the 'approximately 95' trees exceeds the amount of the checks in the substantive counts of the Indictment by a factor of about fourteen." These defendants argue that there was a lack of direct evidence connecting them to sites and therefore losses other than those containing stumps for the 21 logs covered by the allegations in Counts II through XIII.

The government's evidence showed that all 95 trees were harvested in a manner similar to the 21 logs identified in the substantive counts. Specifically, it showed that at each site, chains were attached to neighboring trees so that a pulley mechanism could raise the logs from the ground onto a truck; that only the butt logs were retrieved, leaving useful logs at the site; that trucks, as distinct from skidders, came to each site to remove the logs; that stumps were covered with leaves and mud; and that the debris left at the site was the same, including the same brand of beer. We conclude that this evidence was sufficient to permit the district court to find, by a preponderance of the evidence, that the defendants, who were shown to have been

responsible for the theft of 21 logs through the matching of "cookies" and stumps, were also responsible for the removal of all 95 trees.

These defendants argue nonetheless that the conditions at the 25 sites were not unusual and therefore not probative of any distinctiveness to link the sites:

> If someone who does not own a logging company is going to steal logs from off-road areas in the [Monongahela National Forest], he has two choices: carry the logs out on his shoulder, or load the logs into small trucks. Given the immense weight of such logs, the former method is essentially impossible. Thus, the use of small trucks is not a distinguishing feature of such a crime. The use of small trucks and the lack of specialized equipment also dictates the use of chains on surrounding trees to load the logs onto the trucks, so that is not a distinguishing feature either.

The defendants' argument, however, falls from its own weight. While we agree that the logs could not be carried out of the forest on shoulder, there were several additional ways by which they could have been removed, making the way selected by the defendants more distinctive than the defendants would have it. First, for example, thieves could have used a flatbed "tow" truck with a winch and a hydraulic mechanism to raise the front and lower the rear of the flatbed to the ground, such as is used when picking up an automobile. Thieves could also have used a flatbed truck that has attached to it a small boom to lift the log onto the truck. By an even more apparent and traditional method, the logs could have been rolled onto the flatbeds by means of wooden rails and ropes. And thieves could have used a truck equipped with a winch or pulleys to pull a log up a rear ramp onto the flatbed. The use of a neighboring tree to rig a pulley, indeed, might be the least obvious way.

The defendants also note that other evidence at the site was not distinctive. They assert as not unusual the fact that thieves took "only the most valuable portion of the tree. Most thieves who break into homes concentrate on the most valuable and portable items and leave the rest." They also note that the items like "Budweiser cans, other drinks, food wrappers and food, 'spit' cups, cigarette butts, and clothing items from the sites . . . can be found throughout the [Monongahela National Forest,] not just at [the] theft sites." Finally, they argue that "[s]mearing some mud and leaves on the stumps and logs would probably occur to a four year-old, and is no more a distinguishing feature than the fact that most robbers who use masks remember to take the mask with them."

But again, the defendants' arguments overlook the evidence. There was no evidence that the debris observed at each of the sites was prevalent in the Monongahela National Forest. To the contrary, the National Forest officials considered the debris to be unique to the sites. And because no one would suggest that leaves and mud on a stump would conceal the loss of a large black cherry tree, the use of such an ineffective method, that would only "occur to a four year-old," is all the more distinguishing. Finally, the defendants do not address the fact that all of these distinctive factors appeared at all of the sites and that their confluence by itself presents a distinctive factor, suggesting that the sites were linked to each other.

■ In short, we do not believe that the defendants have demonstrated that the district court had insufficient evidence from which to conclude that the loss from all 25 sites was caused by the same conspiracy.

## B

Michael Newsome makes the additional argument that, based on a special interrogatory answered by the jury, the loss attributable to him could be no more than $1,000, both for purposes of sentencing and for purposes of restitution. Michael Newsome argues:

Because of the way the special interrogatory in the verdict form for Count One was worded, the jury did not merely find that the Government failed to prove beyond a reasonable doubt that the amount of loss attributable to the conspiracy of which Appellant Michael Newsome was a part was more than $1,000.00, it was an express finding that the Government *had* proved beyond a reasonable doubt that the amount of loss was $1,000.00 or less.

He argues, therefore, that it was error to impose restitution of $248,459.53 with respect to him. We disagree.

■ Michael Newsome cannot derive the comfort that he claims from the jury verdict form. On its face, the verdict form concludes that Michael Newsome was "guilty" of Count I of the indictment, charging conspiracy, and "not guilty" of Count XI, charging him with theft of a tree on June 6, 2000, having a value of at least $1,270. The special interrogatory then goes on to read:

Having found the defendant guilty of Count One, the jury further finds that the government has proven beyond a reasonable doubt that the value of property of the United States *that the defendant stole, purloined, or knowingly converted,* involved . . . $1000.00 or less.

(Emphasis added). One can only conclude that in finding Michael Newsome "not guilty" of Count XI, the only substantive count charging him with the actual theft of a tree, the jury would have to find in its answer to the special interrogatory that

"the value of property of the United States *that [Michael Newsome] stole* . . . involved . . . $1000.00 or less." That finding does not contradict the jury's finding that Michael Newsome was guilty of *conspiracy* to steal. Indeed, the evidence showed that Michael Newsome was involved in the conspiracy during its entire term. Accordingly, the district court properly ordered restitution by Michael Newsome with respect to the loss caused by the conspiracy as a whole.

## C

Finally, Dallas Newsome contends that the district court erred in finding the losses attributable to him, both for the purpose of determining the offense level for sentencing him and for the purpose of ordering restitution. He asserts that the jury only found him guilty of stealing two logs from one tree on June 6, 2000, with a value of $1,784. As he explains:

Dallas Newsome was convicted of participating in the sale of two logs from one tree; the sale price for those two logs was $1,784.00. Even if we assign additional value to the remainder of the tree and its products, it would be hard to come up with a total value of more than twenty-five hundred dollars. But he has been threatened with an order of restitution of nearly a quarter of a million dollars, an amount over one hundred times the loss connected specifically with him.

In addition to arguing that the district court erred in not limiting the loss attributable to him to $1,784—both for determining his term of imprisonment and for ordering restitution—he argues that the order of restitution in the amount of $248,459.53 was disproportionate and therefore excessive, in violation of the Eighth Amendment.

The district court made two different loss findings for Dallas Newsome, one for the purpose of determining the offense level and one for ordering restitution. For determining the offense level, the district court found that Dallas Newsome became a member of the conspiracy by "at least" May 2000 and that from May to July 2000—while Dallas Newsome was a member of the conspiracy—the conspiracy caused a loss of $32,321.52 to the United States. On the basis of that finding, the court sentenced Dallas Newsome to 15 months' imprisonment. *See* U.S.S.G. § 1B1.3, cmt. n. 2 (2000) (defining relevant conduct); U.S.S.G. § 2B1.1(b)(1)(G) (2000) (enhancing offense level by amount of loss caused). In ordering restitution, the district court found that Dallas Newsome was a member of the conspiracy charged in Count I and, because he was a member responsible for the acts of the conspiracy, held him liable for restitution in the amount of $248,459.53, the amount of loss that *the conspiracy* caused to the United States. In making the distinction between its loss finding for purposes of determining the relevant conduct and its loss finding for purposes of ordering restitution, the district court explained:

> [The $32,321.52 amount] is the amount of relevant conduct that will determine the offense level.

> \* \* \*

> In other words, I find as a fact that it can be proved by a preponderance and has been proved by a preponderance that Mr. Newsome *was involved in the conspiracy at least in May and June of 2000 and that that is the amount of the relevant conduct* which is chargeable to him.

> That is not the same question as what is the proper amount of the restitution which is chargeable to him for purposes

of the loss because there we are going to look to the question of whether charging him with the amount of restitution jointly and severally is disproportional to the gravity of the harm.

(Emphasis added).

 In addressing Dallas Newsome's arguments, we must first point out that much of his argument is based on the assertion that he was only convicted of selling two logs having a value of $1,784. Relying only on the Count XII conviction, he contends that under *Hughey v. United States,* 495 U.S. 411, 418, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), a court may order restitution only for the loss caused by "the offense of conviction," which he contends is his one substantive count of theft. He fails to recognize that he was convicted of *both* Count XII, charging him with stealing a tree "having a value of at least $1,784" *and* Count I, charging him with being a member of a conspiracy that operated from December 1998 to July 2000, and that the conspiracy caused the United States a loss of $248,459.53. His principal argument thus overlooks the conspiracy conviction. And under conspiracy law, he is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him. *See Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

Turning to the district court's observation that the determinations of the losses for the proper offense level and for ordering restitution present different questions, we conclude that the district court acted in accordance with the relevant law. The amount of losses relevant to finding the appropriate offense level and therefore the proper sentence of imprisonment is, as the district court stated, "not the same question" as the amount of losses properly covered by an order of restitution. *See*

*United States v. Laney,* 189 F.3d 954, 964–66 (9th Cir.1999) (noting that for the Sentencing Guidelines, relevant conduct—which may be broader than conduct for the offense of conviction—is considered and that for restitution, the "causal connection between the offense of conviction and the victim's harm" is considered). *But see United States v. Cain,* 134 F.3d 1345, 1349–50 (8th Cir.1998) (stating, without discussion or reference to the restitution statute, that the defendant's date of entry into the conspiracy limited his loss liability for purposes of sentencing as well as for purposes of restitution). Indeed, these loss findings serve two distinct purposes.

Any term of imprisonment calculated under the Sentencing Guidelines is a function of the defendant's "offense level" and his criminal history category. The offense level, in turn, is determined by "relevant conduct," rather than by the conduct supporting the offense of conviction. Thus, under U.S.S.G. § 1B1.3, relevant conduct is determined on the basis of

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . in the case of a jointly undertaken criminal activity . . ., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1) (2000). As the Application Notes point out, "[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." *Id.* at cmt. n. 1. And although relevant conduct for purposes of determining the offense level may be broader than the conduct supporting the offense of conviction, it may also be narrower. Thus, the Application Notes provide:

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant.

*Id.* at cmt. n. 2; *cf. Laney,* 189 F.3d at 965 (noting, in circumstances where the defendant remained a member of the conspiracy throughout, that the relevant conduct could be broader than the conduct of conviction). Focusing particularly on the offense of conspiracy, the Application Notes point out that the defendant's relevant conduct may not extend to all the conduct of the conspiracy:

> A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct (*e.g.,* in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level).

*Id.* And as the relevant conduct determines the offense level for finding the sentencing range, so too does the loss caused by the relevant conduct—in this case the losses caused to the United States by the portions of the conspiracy attributable to Dallas Newsome as relevant conduct. *See* U.S.S.G. § 1B1.3(a)(3) (2000); *see also* U.S.S.G. § 2B1.1(b) (2000).

Applying these principles to the circumstances of Dallas Newsome, the district court made an "individualized determination," finding that "even if [Dallas Newsome] was working full time [in Tennessee] from January through April [2000], he was not doing that in June, in May." Accordingly, the court made the following finding applicable to determining Dallas Newsome's offense level:

I find as a fact that it can be proved by a preponderance and has been proved by a preponderance that Mr. Newsome was involved in the conspiracy at least in May and June of 2000 and that that is the amount of the relevant conduct which is chargeable to him.

The court then determined the loss caused by the conspiracy for that period to be $32,321.52. When these findings were applied under the Sentencing Guidelines, the offense level was enhanced by six levels, as directed by U.S.S.G. § 2B1.1(b)(1)(G), providing for a six-level enhancement when a theft loss is more than $20,000. After all other adjustments were made to the offense level, the result was a level 14, resulting in a sentencing range for Dallas Newsome of 15 to 21 months' imprisonment. The court sentenced Newsome to 15 months' imprisonment.

Addressing restitution as a question distinct from the loss finding for determining offense level, the district court properly focused on the Mandatory Victims Restitution Act of 1996 ("MVRA"). Recognizing the mandatory duty to impose restitution caused by the offense, the district court looked at the loss to the government ($248,459.53) and the counts for which Dallas Newsome was convicted (Counts I and XII) and found the loss caused by the conspiracy to be $248,459.53. The court ordered that Dallas Newsome pay restitution at a rate of $75 per month after he has served his prison sentence. Because

of the seriousness of the loss caused and the crimes committed and noting that this restitution was less than the amount of fine that Congress authorized for violations of both 18 U.S.C. § 371 and 18 U.S.C. § 641, the court concluded that the order of restitution was not "disproportionate," as Dallas Newsome contended.

We conclude that the district court properly applied the MVRA and appropriately distinguished the loss for ordering restitution from the loss for determining the offense level. The MVRA was enacted with the purpose that "courts order full restitution to all identifiable victims of covered offenses, while guaranteeing that the sentencing phase of criminal trials do not become fora for the determination of facts and issues better suited to civil proceedings." S.Rep. No. 104–179, 1996 U.S.C.C.A.N. 924, 931. The Senate Report pointed out that "[t]his legislation is needed to ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due. It is also necessary to ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society." *Id.* at 925. Thus, with the purpose and intent of restoring *the victim,* Congress mandated that for property offenses and certain other crimes, "the court *shall order* ... that the defendant make restitution to the victim of the offense," 18 U.S.C. § 3663A(a)(1) (emphasis added), and that "[i]n each order of restitution, the court shall order restitution to each victim in the *full amount* of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant," *id.* at § 3664(f)(1)(A) (emphasis added). Where more than one defendant participates in a crime, as in a conspiracy, the statute allows the court to "make each defendant liable for payment of the *full amount* of

restitution." *Id.* at § 3664(h) (emphasis added).

The MVRA does not focus on "relevant conduct" as defined by the Sentencing Guidelines but rather on the "offense of conviction" when describing the losses subject to a restitution order. Thus, the statute requires that defendants "make restitution to the *victim of the offense.*" 18 U.S.C. § 3663A(a)(1) (emphasis added). And the Act defines "victim" to mean a person "directly and proximately harmed *as a result of the commission of an offense.*" *Id.* § 3663A(a)(2) (emphasis added). In specifying when restitution is mandatory, the statute requires that the defendant, "in the case of *an offense resulting in damage to or loss or destruction of property of a victim of the offense,* . . . pay an amount equal to . . . the value of the property." *Id.* § 3663A(b) (emphasis added). Accordingly, under the MVRA, each member of a conspiracy that in turn causes property loss to a victim is responsible for the loss caused *by the offense. See also Laney,* 189 F.3d at 964–66 (holding that for purposes of ordering restitution under a comparable statute, losses caused by a conspiracy include "not only those resulting from the defendant's individual actions but also others caused by the conspiracy itself"). The MVRA does, however, permit the court, in its discretion, to mitigate the impact that the restitutionary order might have on the defendant, but only in two respects. It may relax the "manner" of payment based on the defendant's financial resources, and it may apportion the payment among defendants if more than one defendant has contributed to the loss. *See* 18 U.S.C. § 3664(f), (h).

In addressing the scope of a restitution order under the precursor to the MVRA, the Supreme Court in *Hughey* instructed that it is the "offense of conviction," not the "relevant conduct," that must be the cause of losses attributable as restitutionary liability. The defendant in *Hughey* was charged with multiple offenses but was convicted of only one offense. Yet he was ordered by the lower court to make restitution for losses attributed to relevant conduct under offenses for which he was not convicted. In rejecting this approach when ordering restitution, the Supreme Court stated:

> Congress intended restitution to be *tied to the loss caused by the offense of conviction.* Indeed, had Congress intended to permit a victim to recover for losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction, Congress would likely have chosen language other than "the offense," which refers without question to the offense of conviction.

495 U.S. at 418, 110 S.Ct. 1979 (emphasis added).

In sum, the MVRA *requires* that a court enter an order of *full* restitution when the loss is caused by a property offense, and the focus of the court in applying the MVRA must be on the losses to the victim caused by the offense.

 In this case, it is indisputable that Dallas Newsome was convicted of conspiracy as alleged in Count I, which continued from December 1998 to July 2000. Although he introduced evidence suggesting that he was not involved in the conspiracy while he was working in Tennessee from January through April 2000, the evidence supports a finding of his involvement in May and June 2000. The district court found, for purposes of determining his offense level, that Dallas Newsome "was involved in the conspiracy at least in May and June of 2000." Even though further involvement would not have to be shown, there was also evidence in the record that suggests that Dallas Newsome was in-

volved much earlier. The special agent investigating the thefts from the Monongahela National Forest issued ongoing reports of his investigation, and one of these included a "target list" that identified Dallas Newsome as a suspect in the conspiracy as of February 2000 based on investigations conducted in the fall of 1999.

■ Because the district court found that the *conspiracy* caused the United States to lose 95 black cherry trees and that the loss amounted to $248,459.53, the court properly ordered Dallas Newsome to pay the full amount. It did, however, exercise its discretion to mitigate the burden of the payments on Dallas Newsome by permitting him to pay restitution at a rate of $75 per month once he is released from prison. *See* 18 U.S.C. § 3664(f). The district court did not err in ordering full restitution, nor did it abuse its discretion in permitting Dallas Newsome to pay his obligation in installments.

■ Finally, Dallas Newsome contends that the restitution order violates the Excessive Fines Clause of the Eighth Amendment, citing *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), and *United States v. Bollin*, 264 F.3d 391 (4th Cir.2001). *Bajakajian* holds that an *in personam* forfeiture is excessive "if it is grossly disproportional to the gravity of a defendant's offense," 524 U.S. at 334, 118 S.Ct. 2028, and *Bollin* applied that excessiveness standard to a restitutionary order. The district court addressed this argument and the cases supporting it, and the court concluded that Dallas Newsome's offense of conviction was a serious offense and that a restitutionary order of $248,459.53 was not disproportionate either to the offense or to the loss caused. Not only did the conspiracy last for over a year and a half, causing $248,459.53 in losses to the United States, the district court stated that "the statutory

maximum exposure of this defendant in connection with these kinds of charges ... tells you what the seriousness of the offense or the gravity of the offense is considered to be." The court pointed out that Dallas Newsome was exposed to five years' imprisonment and a $250,000 fine on the conspiracy count under 18 U.S.C. § 371 and ten years' imprisonment and a $250,000 fine on the theft count under 18 U.S.C. § 641. The court concluded, "[T]hese are considered to be serious crimes."

We do not believe that the district court erred in reaching that conclusion, and accordingly we conclude that Dallas Newsome's restitutionary liability does not violate the Excessive Fines Clause of the Eighth Amendment. *See Bajakajian*, 524 U.S. at 338–39, 118 S.Ct. 2028 (determining a forfeiture's proportionality by its relation to the maximum sentence and fine that could be imposed and the harm that the victim suffered); *Bollin*, 264 F.3d at 417–19 (determining the same for a restitutionary order).

V

For the foregoing reasons, the judgments of the district court are *AF-FIRMED*.