**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4621**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EHIZELE AYDO SEIGNIOUS, a/k/a Mike Smith,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  Benson Everett Legg, Senior District Judge.  (1:10-cr-00580-BEL-3)

Argued:  May 15, 2014                    Decided:  July 1, 2014

Before WILKINSON and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion.  Senior Judge Hamilton wrote the opinion, in which Judge Wilkinson and Judge Thacker joined.

**ARGUED:** Arthur Samuel Cheslock, Baltimore, Maryland, for Appellant.  Tamera Lynn Fine, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

HAMILTON, Senior Circuit Judge:

We ordered briefing on several issues pertaining to the district court's order that criminal defendant Ehizele Seignious (Seignious) pay $1,213,347 in restitution, pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. For reasons that follow, we affirm the district court's order of restitution.

We also affirm Seignious' convictions and sentence in the face of the brief filed by Seignious' appellate counsel, pursuant to Anders v. California, 386 U.S. 738 (1967), the pro se supplemental brief filed by Seignious, and our court's obligation under Anders to "conduct 'a full examination of all the proceeding[s] to decide whether the case is wholly frivolous,'" Penson v. Ohio, 488 U.S. 75, 80 (1988) (quoting Anders, 386 U.S. at 744) (alteration in original).

I.

A.

On April 12, 2012, Seignious pled guilty, without benefit of a plea agreement, to one count of conspiracy to commit bank fraud, 18 U.S.C. § 1349, one count of access device fraud, id. § 1029(a)(4), one count of bank fraud, id. § 1344, and one count of aggravated identity theft, id. § 1028A. The charges stem from a massive and organized scheme to use stolen credit card

- 2 -

information to create counterfeit credit cards and to use such cards to make retail purchases of gift cards and high-end merchandise to be sold or returned for cash. The scheme spanned nearly four years——from December 2007 through at least August 2010.

Following Seignious' guilty plea, but prior to his final sentencing hearing, the district court conducted five evidentiary hearings over the course of two months to address, inter alia, the parties' dispute regarding the applicable loss figure under United States Sentencing Guidelines (the Guidelines or USSG) § 2B1.1(b)(1). During these hearings, the government offered the testimony of numerous cooperating witnesses who were involved in the scheme, the testimony of an investigative agent with the Secret Service who worked extensively on the case, and, through such agent, a summary exhibit of physical and documentary evidence regarding actual and intended losses caused by the bank fraud conspiracy.

Sherice Jones (Jones), one of the initial four coconspirators in the case, testified that Seignious introduced her to the other two primary coconspirators——brothers Moadian Bratton-Bey (Moadian) and Boaz Bratton-Bey (Boaz).[1]

---

[1] For ease of reference, we refer to Seignious, Jones, Moadian, and Boaz collectively as "the Initial Coconspirators."

During its infancy, the conspiracy involved recruiting employees at legitimate businesses such as restaurants and hotels to use skimmer devices to record customers' credit card numbers and then deliver those numbers to the Initial Coconspirators. Eventually, the conspiracy grew to include the purchasing of large volumes of credit card numbers from foreign countries, including China and Russia, over the Internet.

Credit card numbers in hand, the Initial Coconspirators manufactured fraudulent credit cards using specialized printers and other equipment purchased by Seignious, Moadian, and Boaz. The Initial Coconspirators also counterfeited photo identification cards to accompany the fraudulent credit cards. The Initial Coconspirators would then use the newly minted credit and identification cards to purchase high-value merchandise in various retail stores. To convert their purchases to cash, they would return the merchandise for refunds or sell the merchandise to third parties.

Jones also explained that the conspiracy involved purchasing individuals' identifying information from a local business which specialized in assisting customers with passport applications. Jones and Seignious would use such information to purchase or rent cars and property and to open new credit card accounts. Jones noted that Seignious used another person's identifying information to rent an apartment where the

conspiracy based its operations and where Seignious personally produced counterfeit credit cards.

As the conspiracy grew, the Initial Coconspirators recruited numerous other individuals known as "strikers" to handle the necessary interaction with retailers. This division of labor produced a tiered hierarchy of crews, comprised of five to six individuals each, who were managed and supplied with fraudulent credit cards by the Initial Coconspirators. In total, Jones estimated that over fifty individuals were recruited to assist in the conspiracy which eventually expanded to other states up and down the eastern seaboard of the United States.

Regarding the conspiracy's profitability, Jones testified that, once fully operational, the conspiracy involved three to five crews each making $5,000 to $10,000 in fraudulent purchases per day. Jones estimated that the scheme netted millions of dollars in merchandise through the use of over 1000 counterfeit credit cards. Jones explained that, on average, each card the conspiracy produced that proved operational would be used to make three to four purchases of $1,500 to $2,000 each.

Shelia Allen, a striker in the conspiracy, testified that she alone purchased roughly $8,000 worth of televisions per week from January to April 2009. Another striker in the conspiracy, Mandy Myers (Myers), estimated that she alone used counterfeit

credit cards to purchase around $400,000 to $500,000 worth of merchandise during her fifteen-month involvement in the conspiracy.

Jermaine Dansbury (Dansbury), a mid-level manager who the government refers to as a wrangler, estimated that some weeks his crew purchased between $5,000 and $20,000 worth of merchandise.

Secret Service Special Agent Scott Windish (Agent Windish), one of the lead investigative agents in the case, testified last on behalf of the government. Of relevance on appeal, through his testimony, Special Agent Windish laid the foundation for admission of Government Exhibit 1A. Government Exhibit 1A consists of a thirty-six page, color-coded document, in a twelve-column spreadsheet format. Government Exhibit 1A lists 1827 credit card numbers with each credit card number and its corresponding information coded in black (1,460), red (49) or blue (318).[2]

Per Special Agent Windish's testimony, black coding represents credit card numbers found on computers used by the conspiracy or found on computer printouts belonging to the conspiracy. The conspiracy purchased the credit card numbers

---

[2] The government introduced an earlier version of this exhibit as Government Exhibit 1. Because Government Exhibit 1A is the final version, we do not consider the content of Exhibit 1.

coded in black in bulk amounts from persons in foreign countries via Internet transactions known as "credit card dump[s]." (J.A. 720). With respect to 211 of the 1,460 credit card numbers coded in black, Exhibit 1A lists actual losses totaling approximately $606,000. Although Exhibit 1A does not specifically list the date upon which each loss occurred, Special Agent Windish testified that he and the other agents who prepared Exhibit 1A included losses with respect to a fraudulent transaction only if the fraud occurred during the duration of the conspiracy. In fact, he specifically testified that "[i]f we found a transaction that occurred before or after this scheme was going on, it was not included in the spreadsheet." (J.A. 738). Under cross-examination, he conceded, however, that, with respect to the credit card numbers coded in black, the possibility existed that the corresponding loss listed could have been caused by a non-member of the conspiracy who illegally purchased and used the same number during the duration of the conspiracy.

Per Special Agent Windish, red coding represents credit card numbers with the attributes of credit card numbers coded in black, plus the existence of evidence verifying usage by the conspiracy, for example, a receipt in a vehicle in which merchandise purchased with the counterfeit credit card was recovered or video surveillance of a member of the conspiracy

using such card. Exhibit 1A contains 49 credit card numbers and corresponding information coded in red with actual losses totally approximately $84,000.

Special Agent Windish explained that blue coding represents credit card numbers and their respective related information for which the investigation uncovered evidence verifying usage by the conspiracy, but did not find such numbers on computers used by the conspiracy or on computer printouts belonging to the conspiracy. Exhibit 1A contains 318 credit card numbers and corresponding information coded in blue with actual losses totaling approximately $523,000.

Special Agent Windish further testified that he and other case agents compiled Exhibit 1A as a master spreadsheet of the evidence gathered over the course of the criminal investigation of the conspiracy which evidence was put on "initial spreadsheets [that] were created as arrests were occurring, as warrants were occurring, before we were preparing evidence and discovery, as we were getting evidence from banks or from stores and receipts." (J.A. 731). He also described the various methods he and the other agents used to weed out incomplete or unreliable information and to avoid double-counting.

On July 20, 2012, the district court sentenced Seignious to 120 months' imprisonment and three years' supervised release. Pursuant to the MVRA, id. § 3663A, the district court ordered

Seignious to pay $1,213,347 in restitution at the rate of $25 per month; payments to begin when Seignious starts serving his term of supervised release. The $1,213,347 amount is the identical amount of restitution sought by the government, which amount the government asserted below it had established in actual losses caused by the conspiracy through the testimony of Special Agent Windish, as aided by Government Exhibit 1A.

Notably, the district court determined the restitution amount without making findings on the record regarding the actual losses the scheme caused specific victims. Accordingly, instead of identifying individual victims and their losses, the district court's judgment simply directed that restitution be paid to the Clerk of Court.

Seignious noted this timely appeal on August 7, 2012. Roughly one week later, the government submitted a document for filing which specifies the total actual losses suffered by each of the banks and retailers listed as victims in Government Exhibit 1A. Such document, which the government refers to as the Restitution Worksheet, also specifies the victims' names and respective addresses. On August 15, 2012, the district court entered the Restitution Worksheet as a sealed document on its docket.

Seignious' appellate counsel (Appellate Counsel) filed an Anders brief, certifying that there are no meritorious issues for appeal, but questioning whether the district court adequately complied with Federal Rule of Criminal Procedure 11 when accepting Seignious' guilty plea and whether the district court properly sentenced Seignious. For his part, Seignious filed a pro se supplemental brief, in which he contests the district court's application of several sentencing enhancements. The government did not file a response to either brief.

Based upon our court's obligation under Anders to independently review the record, we ordered Appellate Counsel and the government to submit briefs addressing: (1) whether the government and the district court sufficiently complied with § 3664(a)-(d); (2) if so, whether the restitution order is adequately supported by the evidence, and whether the district court sufficiently explained its reasoning when imposing restitution; and (3) if so, whether the district court erred in failing to specifically identify in the judgment the victims eligible to receive restitution and their respective losses. Our order also directed that, to the extent not already in the record on appeal, the government provide a copy of each version of the spreadsheet it had submitted to the district court to

support its arguments regarding losses attributable to Seignious' offenses.

In response to our order, Appellate Counsel filed an opening brief addressing the identified issues and the government filed a response brief. Although Appellate Counsel did not file a reply brief, we allowed Seignious to file a pro se supplemental reply brief. Having reviewed the entire record in accordance with Anders, we set the case for oral argument and directed counsel to focus on the restitutionary issues we had ordered briefed.

II.

We first take up the issue of whether the government and the district court sufficiently complied with § 3664(a)-(d), the statutory section setting forth the procedures for issuance and enforcement of an order of restitution under the MVRA. Id. § 3663A(d).

A.

As a threshold matter, we address our standard of review with respect to this issue. Because Seignious never brought to the district court's attention any deficiency in the government's and/or the district court's compliance with such procedures, we are constrained to review for plain error. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial

rights may be considered even though it was not brought to the court's attention."). See also Puckett v. United States, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue. . . . If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed.").

Plain error review has four prongs. The first prong requires the existence of legal error "that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant." Id. at 135. The second prong requires that the legal error at issue "be clear or obvious, rather than subject to reasonable dispute." Id. The third prong requires that the clear or obvious legal error at issue "have affected the appellant's substantial rights, which in the ordinary case means [the defendant] must demonstrate that it 'affected the outcome of the district court proceedings.'" Id. (quoting United States v. Olano, 507 U.S. 725, 734 (1993)). "Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation

of judicial proceedings." Id. (internal quotation marks omitted) (alteration in original).

B.

The MVRA provides that, "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of an offense [against property under Title 18, including any offense committed by fraud or deceit], the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . ." Id. § 3663A(a)(1). See also id. § 3663A(c)(1) ("This section shall apply in all sentencing proceedings for convictions of . . . any offense—(A) that is— . . . (ii) an offense against property under this title . . . , including any offense committed by fraud or deceit . . . ."). Notably, "under the MVRA, each member of a conspiracy that in turn causes property loss to a victim is responsible for the loss caused by the offense," not merely for the losses caused by a particular conspirator's overt acts. United States v. Newsome, 322 F.3d 328, 341 (4th Cir. 2003). The MVRA further provides that "[a]n order of restitution under [the MVRA] shall be issued and enforced in accordance with section 3664." Id. § 3663A(d).

Section 3664(a), for its part, directs the district court to order preparation of a presentence report that will include "information sufficient for the court to exercise its discretion

in fashioning a restitution order" including "to the extent practicable, a complete accounting of the losses to each victim . . . and information relating to the economic circumstances of each defendant."  Id. § 3664(a).  Section 3664(b) directs the district court to disclose such information to the parties. Section 3664(c) specifies that "this chapter [(Miscellaneous Sentencing Provisions)], chapter 227 [(Sentences)], and Rule 32(c) of the Federal Rules of Criminal Procedure [(Sentence)] shall be the only rules applicable to proceedings under this section."  Id. § 3664(c).

In addition, under § 3664(d), "to the extent practicable," the government must provide information concerning restitution to the probation officer sixty days in advance of the scheduled sentencing date, id. § 3664(d)(1); the probation officer, in turn, must, to the extent practicable, provide notice to and collect information from victims, id. § 3664(d)(2), and the defendant must provide the probation officer with information concerning his background, financial resources and ability to pay restitution, id. § 3664(d)(3).  Under § 3664(d)(4), the district court can require other information, including documentation or testimony.  "If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing," the district court can set another date for disclosure of this

information, up to ninety days after sentencing.  <u>Id.</u> § 3664(d)(5).

C.

Our thorough review of the record regarding the procedural history leading to the district court's order of restitution reveals that restitution was imposed without the various procedural requirements of § 3664(a)-(d) being observed.  Such circumstance, however, entitles Seignious to no appellate relief.  This is so because, assuming <u>arguendo</u> that the imposition of restitution in this case without the various procedural requirements of § 3664(a)-(d) being observed constitutes clear or obvious legal error, Seignious has failed to carry his burden on appeal of demonstrating that such error affected his substantial rights, <u>i.e.</u>, that such error "'affected the outcome of the district court proceedings.'" <u>Puckett</u>, 556 U.S. at 135 (quoting <u>Olano</u>, 507 U.S. at 734).

The record leaves no doubt that the district court would have imposed the same amount of restitution on Seignious regardless of whether every requirement of § 3664(a)-(d) had been meticulously met in his case.  When the district court imposed restitution at Seignious' final sentencing hearing, on July 20, 2012, it stated as follows:  "I impose restitution in the amount stated by government counsel, which is $1,213,347." (J.A. 889).  The district court's reference to "the amount

- 15 -

stated by government counsel," refers to the following colloquy between government counsel Assistant United States Attorney Tamera Fine and the district court earlier during the same hearing:

> [MS. FINE:] And, finally, Your Honor, United States has established that there are actual losses in the amount of $1,213,347 in this case. We would ask that a restitution order in that full amount be entered, joint and several with other defendants in this case.
>
> THE COURT: If you could say that amount again, please?
>
> MS. FINE: Certainly. The amount that was testified to by Special Agent Windish from his spreadsheet . . . is $1,213,347. Thank you, Your Honor.
>
> THE COURT: Good. Thank you, Miss Fine.

(J.A. 866).

The spreadsheet to which government counsel refers in this quoted passage from the transcript of Seignious' sentencing hearing is Government Exhibit 1A. To reiterate, the government introduced Exhibit 1A through the testimony of Special Agent Windish during the last of five hearings held over the course of two months for the purpose of taking evidence on Guidelines' issues in dispute for sentencing, including the applicable loss figure under USSG § 2B1.1(b)(1). This Guidelines' section provides for increasing amounts of levels to be added to a defendant's base offense level under the Guidelines based upon

the greater of actual loss (i.e., "the reasonably foreseeable pecuniary harm that resulted from the offense"), USSG § 2B1.1(b)(1), comment.(n.3(A)(i)), or intended loss (i.e., "the pecuniary harm that was intended to result from the offense . . ."), id. § 2B1.1(b)(1), comment.(n.3(A)(ii)).

Seignious had the opportunity to cross examine Special Agent Windish about how he arrived at the figure of $1,213,347 in actual losses caused by the conspiracy and about the creation of Exhibit 1A. In fact, Seignious availed himself of these opportunities and presented argument to the district court that, with respect to USSG § 2B1.1(b)(1), "the amount of [actual fraud] loss that the government has sufficiently proven attributable to this conspiracy is $251,496." (J.A. 518). The district court rejected this argument and found, for purposes of USSG § 2B1.1(b)(1), the loss figure to be between $2.5 and $7 million, which range the district court characterized as "a more than conservative loss figure . . . ." (J.A. 1020). Notably, in support of the district court's characterization of this loss figure as conservative, the district court stated in its sentencing memorandum that "the cooperator testimony established by a preponderance [of the evidence] that the actual losses attributable to the conspiracy exceeded $7 million." Id. In this regard, the district court summarized the testimony of the following three cooperating witnesses——Jones, Myers, and

- 17 -

Dansbury. Seignious had the opportunity to cross examine each of these witnesses as well.

In sum, all of the evidence upon which the district court relied in determining the appropriate amount of restitution to impose upon Seignious under the MVRA was before the district court in the context of resolving the parties' dispute regarding the appropriate loss amount to be used in applying USSG § 2B1.1(b)(1). Seignious had fair opportunity to challenge such evidence. Under these circumstances, we are not surprised that he cannot show prejudice resulting from restitution being imposed upon him without, in large part, the various procedural requirements of § 3664(a)-(d) being observed. Accordingly, Seignious fails the third prong of plain error review on this issue.

## III.

We now turn to consider whether the restitution order is adequately supported by the evidence. At no point below did Seignious object to the amount of restitution imposed upon him or dispute the amount of restitution proposed by the government. Accordingly, as Seignious concedes, we are constrained to review this issue for plain error. Fed. R. Crim. P. 52(b). See also Puckett, 556 U.S. at 134.

Under plain error review, we must first consider whether the district court committed legal error. Puckett, 556 U.S. at 135. In the present context, this means that we must first consider whether the district court's factual finding that, based upon the preponderance of the evidence, the bank fraud conspiracy caused $1,213,347 in actual losses is clearly erroneous. 18 U.S.C. § 3664(e) (district court to resolve any dispute as to proper amount of restitution by preponderance of the evidence); United States v. Wilkinson, 590 F.3d 259, 271 (4th Cir. 2010) (district court's actual loss finding under MVRA is reviewed under clearly erroneous standard). In answering this question, we remain mindful of the Supreme Court's oft-quoted delineation of when a district court's finding is clearly erroneous: "[W]hen although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Some thirty-seven years later, the Court explained that "[t]his standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). Rather, as the Court cautioned, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its

- 19 -

entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 573–74.

Here, we conclude that the district court's account of the evidence is plausible in light of the record viewed in its entirety. Accordingly, we uphold the district court's finding of fact that the bank fraud conspiracy caused $1,213,347 in actual losses as not clearly erroneous.

The parties are on the same page that Seignious is only responsible to pay restitution under the MVRA for the actual losses suffered by the victims of his offenses, including the conspiracy offense. As for Appellate Counsel, in the Supplemental Opening Brief we ordered him to file, Appellate Counsel takes the position that "the evidence was sufficient to support the [$1,213,347] order of restitution." (Supplemental Opening Br. of Appellate Counsel at 22). The government takes the same position.

In his pro se supplemental response to the government's Supplemental Brief, Seignious takes the position that the evidence in the record does not support actual losses of $1,213,347. According to Seignious, at most, the record supports restitution in the amount of $176,336.36. He complains in large part that the testimony of his coconspirators regarding the profitability of their fraud scheme is too vague to be

relied upon by the district court in calculating restitution. He also repeatedly makes the point that Agent Windish admitted the possibility that actual losses attributed on Exhibit 1A to the credit card numbers coded in black (accounting for approximately half of the $1,213,347 figure) could have been caused by other criminals who were not part of the conspiracy at issue in the present case.

Although the district court could have done a better job of making a record below with respect to restitution, after reviewing the record as a whole, we are not convinced that a mistake has been committed with respect to the district court's finding that the conspiracy caused $1,213,347 in actual losses. First, not even counting any of the credit card numbers coded in black, Government Exhibit 1A, as supported by the testimony of Special Agent Windish, supports approximately half of the total actual loss figure right off the bat. These are credit card numbers for which the government obtained evidence directly implicating the conspiracy in the actual loss listed on Government Exhibit 1A.

Now for the credit card numbers coded in black. We readily acknowledge the possibility, as Special Agent Windish acknowledged during his testimony, that other criminals could have separately obtained the same credit card numbers as the bank fraud conspiracy at hand and caused the losses listed on

- 21 -

Exhibit 1A during the exact same time period the conspiracy at hand operated.  The problem for Seignious, however, is that the conclusion that the bank fraud conspiracy at hand caused the actual losses occurring during the life of such conspiracy with respect to the credit card numbers indisputably illegally obtained by and found within the care, custody, and control of such conspiracy is plausible in light of the record viewed in its entirety.

Added on top of the testimony of Special Agent Windish and Government Exhibit 1A is the testimony of Seignious' numerous coconspirators.  The district court expressly credited and accepted all of the following testimony of Seignious' codefendants Jones, Myers, and Dansbury, as summarized by the district court in its August 10, 2012 order addressing various Guidelines issues, including the amount of loss under USSG § 2B1.1(b)(1):

> Sherice Jones testified . . . that between 3 and 5 crews of between 3 and 5 strikers each "went out every day" to make fraudulent purchases.  She explained that, depending on the type of merchandise, each crew could purchase anywhere from $5,000 to $10,000 in merchandise per day.  The merchandise was then either sold or returned, for cash, to the store where it had been purchased.  Jones also testified that over the course of the conspiracy, she estimated that the scheme brought in "millions of dollars" worth of merchandise by using "thousands" of fake credit cards.  Mandy Myers, a striker, testified that she personally made between $400,000 and $500,000 in fraudulent purchases over the course of her 15-month involvement in the scheme.  Jermaine Dansbury, a wrangler,

testified that he took crews of 2 to 5 strikers out 4 to 7 times per week, and that his crews could "bring in" between $5,000 to $20,000 per week on average. Dansbury explained that the total amounts were inconsistent based on a variety of factors, but that his crews could sometimes purchase thousands of dollars' worth of merchandise in just a few hours.

(J.A. 1019-20). The district court also held that the evidence amply demonstrated by a preponderance of the evidence that: (1) "there were at least 50 strikers involved in the scheme, though less than a third were actually indicted," (J.A. 1017); (2) during the life of the conspiracy from December 2007 through August 2010 "the illegal conduct was consistent and persistent," id.; and (3) with respect to the scope of the conspiracy, "hundreds of individuals were being victimized and . . . the losses totaled in the millions of dollars," (J.A. 1019).

Although we need not solely rely on Jones' testimony in support of the district court's actual loss finding, Jones' testimony goes a long way to support such a finding and is not too vague to be probative on issues of actual loss as alleged by Seignious. Based upon the most conservative figure in Jones' testimony regarding the fraudulent purchasing modus operandi of a single crew working for the conspiracy during its time of operation (i.e., $5,000 per day), a single crew working for the conspiracy for just one year fraudulently purchased $1,825,000 in merchandise. This amount is $611,653 more than the amount of restitution the district court ordered Seignious to pay under

- 23 -

the MVRA. Given that "[t]he settled law of this circuit recognizes that the testimony of a defendant's accomplices, standing alone and uncorroborated, can provide an adequate basis for conviction," United States v. Burns, 990 F.2d 1426, 1439 (4th Cir. 1993), there is no basis for us to conclude that the district court's actual loss figure of $1,213,347 is clearly erroneous.

Finally, assuming arguendo the district court's actual loss finding is clearly erroneous, thus satisfying the first prong of plain error review, we cannot say that such error is clear or obvious. Puckett, 556 U.S. at 135. Therefore, Seignious fails the second prong of plain error review as well, making going further in our plain error analysis a fruitless exercise. In sum, Seignious is entitled to no relief with respect to his appellate challenge to the district court's factual finding underlying its order of restitution regarding the actual losses caused by the conspiracy.

IV.

We next consider whether the district court sufficiently explained its reasoning when imposing restitution. At no point did Seignious object to the adequacy of the district court's explanation of its reasoning when imposing such restitution.

Accordingly, as Seignious concedes, we review for plain error. Fed. R. Crim. P. 52(b). See also Puckett, 556 U.S. at 134.

Assuming arguendo that Seignious has established the first two prongs of the four prong test for obtaining appellate relief under plain error review, Olano, 507 U.S. at 732, 734, the analysis stops because Seignious cannot establish the third prong—i.e., Seignious cannot establish that the district court's failure to sufficiently explain its reasoning with respect to imposing restitution upon him under the MVRA affected his substantial rights. The overarching point is that there is no reason to believe that the amount of restitution the district court ordered Seignious to pay under the MVRA would have been any different had the district court expressly explained its reasoning in imposing such restitution.

V.

The last issue for which we ordered briefing is whether the district court erred in failing to specifically identify in its July 25, 2012 judgment the victims eligible to receive restitution and their respective losses. Because Seignious filed no objection in this regard, we review for plain error. Fed. R. Crim. P. 52(b). See also Puckett, 556 U.S. at 134.

Under plain error review, we hold Seignious is entitled to no relief. Jumping straight to the third prong of the test for

- 25 -

plain error review (i.e., the prejudice prong), Seignious has failed to establish that the filing of the Restitution Worksheet approximately one week after the filing of his criminal judgment affected his substantial rights. Puckett, 556 U.S. at 135. Accordingly, there is no basis to grant Seignious any appellate relief on this issue.

## VI.

We have examined the issues raised by Seignious in his pro se briefing and his Appellate Counsel's Anders brief. We conclude that all such issues lack merit. Furthermore, in accordance with our obligations under Anders, 386 U.S. at 744, we have reviewed the entire record in this case and find no reversible error. Accordingly, we affirm Seignious' convictions and sentence in toto, as well as the district court's order of restitution.

AFFIRMED